Plainfield Water Co. v. Plainfield.    *83 N. J. L.*

PLAINFIELD-UNION WATER COMPANY, PROSECUTOR, v.
THE INHABITANTS OF THE CITY OF PLAINFIELD.

Argued June 5, 1912—Decided December 7, 1912.

1. Contracts between a private water company and municipalities pursuant to statutory authority, not only give the municipalities a right to a supply of water, but create a public duty on the part of the company to supply consumers under proper regulations, to be enforced by *mandamus* by one not already supplied, or by injunction against cutting off a supply already begun.

2. The legislature may authorize one public agency to condemn property already devoted to a public use by another public agency, but the intention to grant such authority must be manifested in express terms or by necessary implication.

3. The act of April 21st, 1876 (*Comp. Stat.*, p. 823), was not meant to authorize the condemnation either in whole or in part of a water-supply plant supplying several municipalities.

On *certiorari.*

*Certiorari* to review the appointment of commissioners to condemn a portion of the water works of the prosecutor, from which the city of Plainfield and other municipalities in the counties of Union and Somerset are supplied with water.

The prosecutor is a corporation formed by the consolidation of the Plainfield Water Supply Company and the Union Water Company, pursuant to the General Corporation act. The consolidation agreement is dated September 21st, 1906. The Plainfield Water Supply Company existed under a special charter of April 2d, 1869, and the Union Water Company under a special charter of March 17th, 1870. The Plainfield company was authorized to take water from any lake, pond, stream or spring within the county of Union or adjoining counties except the Rahway river and its branches, and to convey the same through Plainfield and adjoining towns. The municipalities were authorized to agree with the company for a supply of water. The Union Water Company was authorized to erect works and lay pipes for the supply of water to the town of Cranford and other places in Union county, and

to make contracts for such supply, and empowered to take and use the water from the Rahway river at or near Cranford. Prior to the consolidation of the two companies contracts had been made; by the city of Plainfield on May 2d, 1892, with the Plainfield Water Supply Company; by the township of Cranford, the township of Westfield, the board of fire commissioners of fire district No. 1 of the township of Union, the borough of Roselle, the borough of Fanwood and the borough of Garwood, with the Union Water Company; and by the township of Fanwood with the Plainfield Water Supply Company. After the consolidation, contracts were made with the borough of North Plainfield, the town of Westfield, the borough of Garwood, the township of Cranford, the borough of Roselle, the borough of Roselle Park and the borough of Kenilworth.

The city of Plainfield seeks by these proceedings to condemn a portion of the works of the consolidated company, and a portion only of the plant of the Plainfield Water Supply Company, as it was prior to the consolidation, including, however, the source of supply.

Before Justices SWAYZE, VOORHEES and KALISCH.

For the prosecutors, *Frank Bergen* and *Gilbert Collins.*

For the city of Plainfield, *Albert C. Wall (William M. Stillman,* on the brief).

The opinion of the court was delivered by

SWAYZE, J. The questions in this case are interesting and most important, and, as far as we know, of first impression. We pass the question as to the extent of the powers and rights acquired by the consolidation of the two water companies, and do not decide whether thereby the right of the Plainfield company was so extended as to justify it in supplying water to municipalities under the Union company charter which it was not authorized to supply under its own. The Plainfield company was, by its charter, authorized to supply not only

the village (now the city) of Plainfield, but also the adjoining towns. If there had been no subsequent legislation, it would be an interesting question whether by the word "towns" in this charter the legislature meant townships as contended by the prosecutor, or whether it meant towns in the narrower sense of more densely populated territory similar in character to the then existing village of Plainfield. This inquiry, we think, becomes unnecessary in view of subsequent legislation. The act of 1888 (*Comp. Stat., p.* 3647, *pl.* 669) ; the act of 1887, relating to boroughs (*Comp. Stat., p.* 268, *pl.* 76) ; and the act of 1899, relating to townships (*Comp. Stat., p.* 5599, *pl.* 65), authorize municipal corporations, boroughs and townships to contract for a water-supply with a private water company; the act of 1888, by express terms, the Borough act of 1897, and the Township act of 1899, by necessary implication, authorize the water company to make the contract. In pursuance of this statutory authority, the consolidated company has made contracts with several municipalities. It can make no difference that some of the contracts were made on the eve of the present proceedings to condemn. Whatever may have been the motives of the water company the municipalities acquired rights thereunder. These rights sprang out of contracts authorized by statutes, but they are more than mere contractual rights, the infraction of which is to be redressed by an action for damages only. In *Boonton* v. *Boonton Water Co., 3 Robb.* 23; *affirmed,* 4 *Id.* 692, the water company had agreed to supply the town five hundred thousand gallons a day, with the right to increase the quantity to one million gallons. The successor of the water company was enjoined from furnishing water from its plant to any person or corporation for the purpose of creating power for mechanical purposes, either by the creation of steam or for propelling any water motor. The effect of the decree was to give the town a paramount right in the water company's source of supply, and as this paramount right was held to bind the successor of the water company that made the contract, it is hardly distinguishable from a right of property in the water. In *Jersey City* v. *Jersey City Water Sup-*

*ply Co.*, 4 *Buch.* 104 (affirmed in this respect, 6 *Id.* 607), the Court of Errors and Appeals enforced specific performance of a contract for the conveyance of water works. If, however, the contracts did not give the municipalities a property right strictly so called in the water-supply, for which compensation must be made upon condemnation, they gave a right to a supply of water from the consolidated company, and created a duty on the part of the company to furnish the supply. This duty is more than a mere duty to perform a contract; it is the public duty of a public service company to supply consumers under proper regulations. *Olmsted* v. *Proprietors of Morris Aqueduct.* 18 *Vroom* 311, 333, overruling *Paterson Gaslight Co.* v. *Brady*, 3 *Dutcher* 245. If this duty is not performed, the wrong may be redressed not merely by an action of the municipality for damages for breach of contract, but by *mandamus* at the suit of a citizen if he is not already supplied with water (40 *Cyc.* 792, *note* 8; *People* v. *New York Suburban Water Co.*, 56 *N. Y. Supp.* 364), just as the Court of Chancery has held in a case of the supply of gas (*Public Service Corporation* v. *American Lighting Co.*, 1 *Robb.* 122, 128) ; or by injunction against cutting off a supply already begun. *Dayton* v. *Quigley*, 2 *Stew. Eq.* 77; *Coe* v. *New Jersey Midland Railway Co.*, 3 *Id.* 440; *Johnston* v. *Belmar*, 13 *Dick. Ch. Rep.* 354; *Washington* v. *Washington Water Co.*, 4 *Robb.* 254.

We have then a case where a private corporation is under a public duty to supply the citizens of several municipalities with water, an article of prime necessity for life and health, and an effort on the part of one municipality to condemn for its own purposes an essential portion of the plant. The effort, if successful, will not only dismember the plant of the water company, but will prevent it from supplying water to citizens of municipalities other than the city of Plainfield, since the city seeks to condemn the source of supply. It is unnecessary to hold that the rights of citizens of these municipalities are increased by the fact that some of the contracts provided for a supply from a specific source at Netherwood, since the public duty is the same under contracts that name no specific source. The city of Plainfield is attempting to

condemn property already devoted to a more extensive public use in such a way as to destroy that use.

The legislature may authorize one public agency to condemn property already devoted to a public use by another public agency, but the intention to grant such authority must be manifested in express terms or by necessary implication. 15 *Cyc.* 614. In *State, Mayor and Aldermen of Jersey City*, v. *Montclair Railway Co.*, 6 *Vroom* 328, the railroad company sought to condemn land held by the city for a prospective reservoir. In *New York, Susquehanna and Western Railroad Co.* v. *Paterson*, 32 *Id.* 408, the city sought to open a street across a railway freight yard. In both cases the right was denied. The Court of Errors and Appeals has recently, by inference, recognized the principle, at least in a case where the pre-existing user will be destroyed or seriously impaired. *Paterson, &c., Railroad Co.* v. *Mayor and Aldermen of City of Paterson, post p.* 535. In the present case, the condemnation of the property sought by Plainfield will destroy the water-supply of other municipalities. Has the legislature given it such power? The city claims the power under the act of April 21st, 1876. *Comp. Stat., p.* 823. This authorizes the city to purchase of any water company owning water works within the city all its real estate, personal property and works, and all its corporate rights, powers, franchises and privileges. The act was subject to a referendum clause, and did not become effective in Plainfield until 1910, four years after the consolidation of the Plainfield company and the Union company. The corporation to which the power of condemnation is applicable, is necessarily the consolidated corporation, which was the only corporation owning water works in Plainfield when the act became effective there. The property authorized to be condemned is all the property, corporate rights, powers, franchises and privileges of the company. Some statutes of the kind may properly be construed as mere enabling acts; the word "all" may mean "all or any." Other statutes may properly be construed as imposing a limitation on the condemning agency; the word "all" may mean "all or none." In the present case, the question is not free from

difficulty. In view of the purpose of the condemnation, the evident intent of the legislature in authorizing the condemnation of the corporate rights, franchises and privileges of the company as well as the property, the fact that the rights of other municipalities must have been contemplated by the legislature in 1876, since it had previously authorized the Plainfield company to supply adjoining towns, and the Union company to supply Cranford and other places, and the importance of securing to everyone dependent thereon a continuous supply of water, we think the legislature in 1876, if it meant the statute to apply at all to a case like the present, must have meant to authorize only the condemnation of the whole plant of the water company, and to use the word "all" in its literal meaning. No other construction would save the rights of other municipalities and their citizens; the city could not take a portion subject to the burden of carrying out the contracts of the water company; the severance in title of the pipe lines at the city's boundary would make it impossible to supply consumers outside the city limits without the use of property still belonging to the water company, and the city for its own supply, the end contemplated by the statute, would not have the power to condemn the right to use those pipes. The legislature cannot be supposed to have contemplated a dismemberment of a water company's plant in such a way that a part of it would be rendered useless; useless to the condemning municipality since it could not acquire that part, and useless to the company because it would be cut off from the source of supply. The city would, under the ordinary rules applicable to condemnation, be compelled to compensate the company for the damage done by the severance to the property not taken, and for the value of the contracts with other municipalities which could no longer be performed. *Long Island Water Co.* v. *Brooklyn,* 166 *U. S.* 685. The city would thus be compelled to pay substantially the whole value of the plant and would acquire for itself a portion only. Such a waste of public money cannot have been contemplated by the legislature, and an examination of the act of 1876, in connection with other contemporaneous legislation, shows that it

was not meant to authorize the condemnation either in whole or in part of a water-supply plant supplying several municipalities. The power given is to supply such quantity of water as may be required by the inhabitants residing within the corporate limits of the city—a power in itself clearly insufficient to authorize the supply of inhabitants of adjoining towns. "To this end," to use the language of the statute, the city is authorized to purchase of any water company owning water works within the city all the real estate, personal property and works, and all the corporate rights, powers, franchises and privileges, and in the event of disagreement as to the amount of compensation, is empowered to condemn. The words "within the city" qualifying the water works authorized to be acquired, naturally import water works situated within the city and not elsewhere; the case where the source of supply might be without the city is provided for by the authority to acquire the rights, powers, franchises and privileges. Although the language is susceptible of a construction that would permit the acquisition of the whole plant, wherever situate, of a company that owned water works within a city, this less natural construction is not in harmony with the end for which the acquisition is authorized—a supply of water to the inhabitants residing within the corporate limits. At that time the acts authorizing contracts by one municipality for the supply of water to another had not been passed. *Pamph. L.* 1877, *pp.* 58, 198; *Pamph. L.* 1881, *p.* 118; *Comp. Stat.,* p. 3643; *Pamph. L.* 1882, *p.* 83; *Comp. Stat.,* p. 835. The legislature was dealing with a situation where each city had, or was to have, its own supply. Section 16 provides that the act shall remain inoperative in any city until assented to by a majority of the legal electors thereof, voting at an election to be held in said city. If the act had been meant to apply to a case where several municipalities were interested in the same water-supply, the legislature would not have given one municipality the right at its own election to condemn the supply of another. The title of the act points to the same construction; it indicates the intent to enable cities to supply the inhabitants with pure and wholesome

water; it seems to indicate a future supply rather than a change of ownership of an existing supply, and it certainly indicates no intent to enable a city to deprive another municipality of an already existing supply. We do not mean to say that the title does not suffice to comply with the constitutional requirement, but it is not such a title as the legislature would have adopted if the act was meant to be as broad in its powers as the city of Plainfield now contends. The narrower construction of the act is in harmony with the words of the title and avoids the possibility of constitutional objections.

It cannot be said that the act of 1876 was meant to establish a general scheme by which a public supply might be substituted for a private supply. If that had been the intent the scope of the act would not have been limited to cities. At that time, the comparative merits of public ownership as against private ownership had not become the subject of common discussion. The subject then before the legislature was evidently the necessity of making some provision for water-supply other than by specially chartered companies as had previously been the custom. The constitutional amendment of 1875 had just been adopted. It thereupon became the duty of the legislature to pass general laws under which corporations might be organized. In pursuance of this duty the legislature passed an act which was approved April 21st, 1876, the same day as the act now before us, under which private water companies might be incorporated. *Pamph. L.* 1876, *p.* 318; *Comp. Stat., p.* 3635. The two acts were parts of a general scheme; one provided for a supply by private water companies, and applied to all municipalities having not less than two thousand and not more than fifteen thousand inhabitants; the other authorized a public supply in cities which at that time included all municipalities having over fifteen thousand inhabitants. The legislature seems then to have thought that smaller municipalities either did not need a water-supply if the population was less than two thousand or ought not to incur the risk of a supply at public expense unless they had attained the rank of cities. That the act relating to cities limited the right to acquire water works to

such as supplied a single city, we have already shown. The act for the incorporation of water companies was similarly limited. It requires the consent of the corporate authorities of the town or city proposed to be supplied with water. This can only refer to a single municipality. We think the legislature, in 1876, omitted to provide for the acquisition by one municipality of water works incorporated for the supply of more than one. The omission at that time was natural. The necessity of legislation for such a situation as is here presented, if apparent at all, was not as clear as it has now become. It is a situation that requires legislation having in view the rights of all municipalities concerned where the supply of water has ceased to be abundant for the increased population, as is sufficiently indicated by the recent legislation for the state water-supply commission. *Comp. Stat., pp.* 5797, 5808.

For these reasons, we think the city of Plainfield has no right to condemn a water-supply which is already devoted in part to the public use of other municipalities. The order appointing commissioners must therefore be set aside, with costs.