[No. 28236. Department Two. March 25, 1941.]

A. C. CARSTENS et al., Respondents, v. PUBLIC UTILITY DISTRICT NO. 1 OF LINCOLN COUNTY et al., Appellants.[1]

[1]Reported in 111 P. (2d) 583.

138

*Underwood & Campbell, Houghton, Cluck & Coughlin,* and *E. K. Murray,* for appellants.

*Post, Russell, Davis & Paine* and *H. E. T. Herman,* for respondents.

SIMPSON, J.—Involved in this appeal is the right of the public utility district of Lincoln county to take by eminent domain proceedings properties belonging to The Washington Water Power Company which are situated in Lincoln, Grant, and Spokane counties.

On or about December 20, 1939, the commissioners of public utility district No. 1 of Lincoln county passed a resolution to acquire by purchase or condemnation properties of plaintiff corporation which were situated in Lincoln county, together with distribution lines located in Grant and Spokane counties. Thereafter, the commissioners caused to be instituted in the superior court of Lincoln county a proceeding in eminent domain, by which they sought condemnation of the properties to which we have just referred. Subsequently, the plaintiffs brought this action to restrain and enjoin the prosecution of the eminent domain proceedings.

By virtue of a stipulation entered into by counsel for the respective parties, a trial was had in which the court considered this case and the application for entry of a decree of public use and necessity in the eminent domain case.

After the trial had been concluded, the court entered its decree to the effect that the defendants did not have the right to acquire the franchises of the company or the properties of the company which were located in Grant and Spokane counties. An injunction was issued which prohibited defendants from proceeding to condemn the franchises of the company or its property in Grant and Spokane counties. Defendants appealed.

The assignments of error are (1) in refusing to dismiss the complaint, and (2) in entering its decree restraining petitioner from acquiring properties of the company located in Grant and Spokane counties.

The record discloses the following facts: Respondent company owns the property sought to be acquired. Respondent A. C. Carstens, Thomas A. Landreth, and V. R. Hyslop are citizens, voters, residents, and taxpayers of Spokane county. Respondent H. H. Higgins is a citizen, resident, voter, and taxpayer of Grant county. Appellants John Lome, Louis Schultz, and A. H. Reilly are the commissioners of public utility district No. 1 of Lincoln county.

Included in the property sought to be acquired is a six hundred thousand volt transmission line extending from Coulee City in Grant county to Almira in Lincoln county. Approximately seventeen miles of this transmission line is located in Grant county west of the Grant-Lincoln county boundary line. No substations are located on the transmission line in Grant county. The first substation on the transmission line is located at Almira in Lincoln county at the end of a transmission line. No objections to the taking of this line were made by respondent company. At the substation located at Almira, electricity is transformed for distribution purposes. A number of distribution lines extend from the Almira substation and serve the town of Almira and some rural areas. Two of these lines extend westerly from Almira into Grant county and serve the town of Hartline and some rural areas adjacent thereto. There is a total of approximately ten miles of distribution line located in Grant · county. From this line, the respondent company sells electricity to about one hundred thirty-eight customers, which produced a gross revenue in 1939 of five thousand dollars. The cost of the distribution line is from fifteen

hundred dollars to two thousand dollars per mile. The distribution lines are not otherwise connected with other lines in Grant county, and if they were not taken by the district, it would be necessary to construct about ten miles of new line to connect it with the existing system of the respondent company at Coulee City in Grant county.

Also included in the property sought to be acquired by the district, was a substation at Davenport in Lincoln county, at which electricity is transformed for distribution purposes. Several distribution lines extend from that substation and serve the city of Davenport, the town of Reardan, and the rural communities. One of these lines extends easterly from Davenport through Reardan, and from there into a small rural portion of western Spokane county. There is a total of fifteen to twenty miles of distribution lines located in Spokane county. From these lines, respondent company sells electricity to eighty-four customers, producing an annual gross revenue of about four thousand dollars. These lines are not connected with other distribution lines in Spokane county, and if they are not taken by the district, it will be necessary to construct three miles of the new line to connect with the existing system of respondent company at a place near Medical Lake in Spokane county.

Transmission lines are such lines as carry a high voltage electrical current to substations where the voltage is reduced so that it may be conducted to the distribution lines. Distribution lines carry the voltage from the transformers to the place where the current is consumed by the customers.

In this case, we are not concerned with the question relative to the condemnation of the transmission lines, for the reason that the respondents admit the right of the public utility district to exercise the power of

eminent domain for the purpose of condemning transmission lines outside of the territorial limits of the district, if the transmission lines are necessary to bring electric current to the system of distribution lines situated within the territorial limits of the public utility district. There is no contention in the instant case that any of the transmission lines sought to be condemned by appellants would not be put to a public use or that it was not necessary to condemn the transmission lines sought by appellants.

The purpose of the act is stated in Rem. Rev. Stat., § 11605 [P. C. § 4498-11], as follows:

"The purpose of this act is to authorize the establishment of public utility districts to conserve the water and power resources of the State of Washington for the benefit of the people thereof, and to supply public utility service, including water and electricity for all uses."

In discussing the questions presented in this case, we have in mind that

"The rule of strict construction shall have no application to this act, but the same shall be liberally construed, in order to carry out the purposes and objects for which this act is intended." Rem. Rev. Stat., § 11615 [P. C. § 4498-21].

Appellants contend that the acquisition of extra-territorial properties is expressly authorized by the public utility act, Rem. Rev. Stat., § 11610 [P. C. § 4498-16], subd. (d), and should therefore be allowed. The act gives the districts the following power:

"To purchase, *within or without its limits,* electric current for sale and distribution within or without its limits, and to construct, condemn and purchase, purchase, acquire, add to, maintain, conduct and operate works, plants, transmission and distribution lines and facilities for generating electric current, operated either by water power, steam or other methods, *within or without its limits,* for the purpose of furnishing said

public utility district, and the inhabitants thereof and any other person, including public and private corporations, within or without its limits, with electric current for all uses, . . . " (Italics ours.)

Respondents, on the other hand, contend that no public use would be served by appellants' acquisition of the distribution lines in Grant and Spokane counties, and that no necessity can be found for a condemnation of those distribution lines.

The question of whether or not a use is a public use is a judicial one, of course, under the provisions of amendment IX of our state constitution.

However, the determinations of public use by the state or its agencies are entitled to great respect by the courts, since they relate to matters which should and must have been known to the legislature. *New York City Housing Authority v. Muller,* 270 N. Y. 333, 1 N. E. (2d) 153, 105 A. L. R. 905. The same approach should be used where, as here, the people of the state have determined the existence of a public use by an initiative vote.

The term "public use" is one which has been examined innumerable times by the courts, but no concise, clear definition thereof has emerged from the mass of judicial language devoted to the subject. Perhaps the best approach to the question is to be found in the following passage from *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 200 Atl. 834:

"On the whole, although the cases on this subject in Pennsylvania have been comparatively few in number, it may fairly be stated that, while firmly maintaining the principle that private property cannot be taken by government for other than a public use, they justify the conclusion that judicial interpretation of 'public use' has not been circumscribed in our State by mere legalistic formulas or philological standards. On the contrary, definition has been left, as indeed it must be, to the varying circumstances and situations which

arise, with special reference to the social and economic background of the period in which the particular problem presents itself for consideration. Moreover, views as to what constitutes a public use necessarily vary with changing conceptions of the scope and functions of government, so that to-day there are familiar examples of such use which formerly would not have been so considered. As governmental activities increase with the growing complexity and integration of society, the concept of 'public use' naturally expands in proportion."

■ The generation and distribution of electric power has long been recognized as a public use by this court. *State ex rel. Washington Water Power Co. v. Superior Court, ante* p. 122, 111 P. (2d) 577.

The only reason, therefore, which respondents can urge as a basis for the contention that the acquisition of the distribution lines here in question would not be for a public use, is that they are located beyond the boundaries of the condemnor.

■ The districts created under this act are constituted municipal corporations. Rem. Rev. Stat., § 11606 [P. C. § 4498-12]. The general rule relative to this question is that municipal corporations may exercise their power of eminent domain beyond their boundaries if they are given the right to do so by legislative enactment.

"The power of the legislature to authorize a municipal corporation to acquire *lands beyond the municipal limits* and for that purpose to exercise the power of eminent domain cannot be disputed. It has long been recognized to exist where the use for which the property is taken is a proper and reasonable public use." 3 Dillon, Municipal Corporations (5th ed.), 1626, § 1028.

"Likewise, a municipality cannot condemn lands within the state but outside its own corporate limits unless the power has been delegated by the legislature. However, it is well settled that the legislature may

delegate such power." 4 McQuillin, Municipal Corporations (2d ed.), 406, § 1619.

Respondents urge, however, that this general rule can only apply to instances in which the acquisition is for the direct benefit of the inhabitants of the condemning municipal corporation.

■ In cases in which municipal corporations have been authorized to acquire privately owned utilities, the public use to which they are to be devoted by the municipal corporation is ordinarily regarded as a higher public use than that to which they were devoted by the private ownership. *State ex rel. Washington Water Power Co. v. Superior Court, supra.*

Respondents contend, however, that the reason for permitting such condemnation, namely, the fact that public ownership results in greater public use and broader public benefit, is lost when the municipal corporation seeks to condemn property beyond its borders, inasmuch as the inhabitants of the extraterritorial districts have no voice in the control nor any share in the profits of the municipal corporation.

Our study of the cases in this jurisdiction has failed to reveal any case in which a municipal corporation has sought to condemn distribution facilities of privately owned utilities outside its borders, when so authorized to do so by statute.

The case of *Farwell v. Seattle,* 43 Wash. 141, 86 Pac. 217, was one in which the city of Seattle attempted to sell water to the city of Ballard, and this court sustained a judgment which had prevented Seattle from carrying out its project. In doing so, we based our position upon the construction and meaning of Bal. Code, § 739, which provided:

"To provide for erecting, purchasing, or otherwise acquiring water works, within or without the corporate limits of said city, to supply said city and its inhabi-

tants with water, or to authorize the construction of same by others when deemed for the best interests of such city and its inhabitants, and to regulate and control the use and price of the water so supplied."

The next case on the subject is that of *Spear v. Bremerton,* 90 Wash. 507, 156 Pac. 825, in which we called attention to a change in the law and held that a city could sell an excess of water supply. This court did, however, hold that a city could not acquire a private water distribution system and its franchises in another city, due to the fact that the legislative enactment did not give that power to the city.

The language of the cited cases reveals that this court has felt bound by the terms of the statutes which it construed, and has not attempted to lay down any general rule exclusive of the statutory provisions. A comparison of the statutes construed in those cases with the one we have before us, brings to light an entirely different situation than obtained in the cited cases. The present act is explicit in stating that public utility districts may acquire by condemnation facilities for sale of power to persons outside the districts, and that the property so acquired may be located outside the districts.

We therefore must turn our search to cases outside this jurisdiction to determine whether or not such authorized condemnation of outside distribution facilities is regarded as a legal exercise of the power of eminent domain for public use.

In *Public Service Co. v. Loveland,* 79 Colo. 216, 245 Pac. 493, the city, in eminent domain proceedings, sought to condemn an electric light system owned and operated by a privately owned corporation. Most of the property was in the city, with a small portion located without the boundaries of the city. In dealing with the question of the right of the city to con-

demn the property which was outside the city limits, the court held that such distribution facilities might be taken, and were for the public use.

Again, in *Colorado Central Power Co. v. Englewood,* 89 F. (2d) 233, in dealing with the right of the city to condemn outside distribution facilities in conjunction with the condemnation of the plant within the city, the court stated:

"A city of the second class in Colorado is vested with power of eminent domain for the acquisition of private property necessary for the construction and operation of water, gas or light works; and the power is not confined to property situated within the city limits. Property outside the city may be taken for such public use if it is needed. *Public Service Co. v. City of Loveland,* 79 Colo. 216, 245 P. 493. Whether the contemplated use is public is a judicial question. Article 2, section 15, Colorado Constitution. If it is public, the necessity or expediency of devoting the property to it is a question for the determination of the city, and when subject to inquiry it must be determined by a board of commissioners appointed by the court. If that determination is not made arbitrarily, or capriciously or in bad faith, it is conclusive and not subject to judicial review. . . .

"The fact that the company is now using the property outside the city limits to furnish its customers with electric energy is not enough to withstand the power of the city to acquire it for the purpose of establishing and operating a municipal system. A city may condemn property of a utility company in use as a part of the system which serves consumers within the city for the purpose of devoting it to a municipal plant. *Public Service Co. v. City of Loveland, supra.* That construction of the controlling provisions of the State Constitution and statutes is binding on us. And our decision in *City of Norton v. Lowden, supra* [84 F. (2d) 663], does not lead to a contrary conclusion. It was there said that the power to destroy or materially interfere with an existing public use of property for another public use, must be found in specific

legislative authority; and it was noted that many states had authorized condemnation where the second use is found to be more essential to the public welfare. There is such legislative authority in Colorado. It was so held in the *City of Loveland* Case [79 Colo. 216, 245 Pac. 493]."

In *Paris Mountain Water Co. v. Greenville,* 110 S. C. 36, 96 S. E. 545, the court held that a city might condemn outside water distribution facilities under a statute which gave cities the right to serve outside communities contiguous to the city. In the course of its opinion, the court stated:

"It is a matter of common knowledge that generally the water supply and reservoirs and lead pipes of many towns are of necessity many miles without the corporate limits. It is also a matter of common knowledge that many of the towns of the State, and chief amongst them Greenville, are surrounded by manufacturing plants domiciled just out of the corporate limits, and by surburban villages operated under separate charters, and divided off from the city by an arbitrary line.

"The suggestion of appellant that the city will go into 'municipal trading,' condemned by Mr. Dillon, does not raise a question of law, but of policy, and that policy has been determined by the Constitution and by the legislature."

In the case of *Potts v. Atlanta,* 137 Ga. 211, 73 S. E. 397, the court permitted the condemnation of sewer facilities outside the city limits, such acquisition being authorized by the legislature. The court stated that the construction of sewers is of such benefit to public health, welfare, and comfort that it is undeniably a public use. The court did not find it any less so because the sewers were to be partly outside the city's boundaries.

In *New Jersey Water Service Co. v. Borough of Butler,* 105 N. J. L. 40, 143 Atl. 759, the water dis-

tribution system which served the condemning borough also served other boroughs, and the condemnor sought to acquire the outside portion of the system along with that which was within its borders. The legislature had authorized the acquisition of such external systems. The court approved the condemnation, basing its conclusions on the impracticality of dismembering the unitary system so as to render the external portions useless, due to being cut off from the source of supply.

The supreme court of the United States, in the case of *Omaha v. Omaha Water Co.*, 218 U. S. 180, 54 L. Ed. 991, 30 S. Ct. 615, 48 L. R. A. (N. S.) 1084, dealt with the power of a city to acquire distribution facilities beyond its borders. The enumerated powers of the city permitted it to acquire outside facilities, the charter providing:

" . . . power to appropriate any waterworks system, plant or property already constructed, to supply the city and the inhabitants thereof with water, or any part thereof, whether lying within said city or in part without the city and within ten miles from the corporate limits of such city . . ."

The reasons given by the court for upholding the right of the city to acquire an operative water plant within and without the city are so compelling that we set out the following excerpt from the opinion:

"The review of the legislation touching the power of the city, and the conclusion of the Circuit Court of Appeals from that legislation, that the city had the power to acquire the system as it existed, and has the power to operate so much of it as is intended to supply the suburban towns adjacent which may be acquired, is full and satisfactory, and meets our approval.

"We are also satisfied with the conclusion of the Circuit Court of Appeals that the acquisition of the system as it existed at the time the city made its

election to purchase was within the contemplation of both the city and the water company, and that the valuation of the system as an entirety was the matter which the appraisers were required to do. What we shall say upon this point will support our conclusion as to the power of the city, for the legislation upon that matter must be read in the light of the subject-matter and of all the known local conditions. The most weighty fact in this connection is, that the system was one single system, having a common source of supply and common main connections therewith. Its dismemberment is not to be thought of unless it is clear that the ordinance exercising the option is so plainly limited to the purchase of only so much of the distributing system as lay wholly within the corporate limits as to admit of no other meaning."

The case of *South Pasadena v. Pasadena Land & Water Co.*, 152 Cal. 579, 93 Pac. 490, held that a city, when authorized, could acquire a distribution system extending into another city's territory, where the whole system was a unit and where to do otherwise would cut off the portion in the outside territory without a source of supply. The court held that it was convenient to acquire the system as a unit in order to accomplish the main purpose of supplying water to those within the city.

The court in *Plainfield-Union Water Co. v. Plainfield*, 83 N. J. L. 332, 85 Atl. 321, held that the city could not condemn part of a water distribution system running through the city under an act which only authorized it to condemn systems for its own supply, due to the fact that it would be depriving other cities of their supply, and no authority to do so was given by the act. Clearly, the legislative enactment there was far narrower than that in the case at bar, but we deem the following language of the court worthy of quotation, inasmuch as it expresses the principle which induces courts to uphold such condemnations

of the outside portions of utility systems, when authorized by statute:

"The legislature cannot be supposed to have contemplated a dismemberment of a water company's plant in such a way that a part of it would be rendered useless; useless to the condemning municipality since it could not acquire that part, and useless to the company because it would be cut off from the source of supply."

The court in that case recognized that a statute authorizing the condemnation of the outside facilities could have been passed by the legislature, but stated that no such right had yet been granted.

From all of the cases discussed we conclude that, where an electric power distribution system owned by a private utility company incidentally overlaps into an adjoining county, and where the overlapping portion would be severed from its source of supply if not also acquired, the authorized acquisition thereof, in conjunction with the acquisition of the main system in the condemnor's county, is an acquisition for the public use, it being for the interest of the public to maintain the system as a unit, instead of cutting off the small overlapping portion from the source of supply. This in no way conflicts with our earlier cases, and is founded on a practical view of the meaning of "public use." We do not feel that "public use" should necessarily be measured in terms of arbitrary political lines, but should be interpreted in the light of the exigencies and facts present in the individual case.

The contention of respondents that no greater public use will be served by the acquisition of the external distribution lines than is now being served by the privately owned corporation, due to the inability of the inhabitants of the outside territory to

share in the profits of the operations, is of no consequence, due to the fact that a municipally owned enterprise of this nature may not be operated for profit, and must establish its rates at the lowest possible point. *Uhler v. Olympia,* 87 Wash. 1, 151 Pac. 117, 152 Pac. 998.

Nor is the fact that the outside persons have no control over the management of the district a sufficient ground for finding that no greater public use is served by acquiring the lines for the district. The control which will be exercised by those in charge of the district's affairs must be for the benefit of the users of the electricity, and there is no basis shown for a conclusion that the outside purchasers will reap any less benefits as a result of their inability to participate in the management.

As for the matter of the necessity of condemning this property, it is the rule that a municipal corporation's determination of necessity in these cases is conclusive upon the courts in the absence of fraudulent, arbitrary, or capricious action by the condemnor. *State ex rel. Washington Water Power Co. v. Superior Court, ante* p. 122, 111 P. (2d) 577.

We are unable to find any evidence in the record to support a conclusion that any action of the enumerated types is present in the case at bar. We believe there were valid grounds for a belief on the part of the condemnor that a reasonable necessity existed for acquiring the incidental portions of the line which lay beyond the political boundaries of the district, and we therefore cannot interfere with the district's determination of necessity.

The individual respondent's next contention is that to permit the district to condemn the outside lines is in violation of Art. I, § 19, of our state constitution, which reads:

"All elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."

They cite the case of *Malim v. Benthien*, 114 Wash. 533, 196 Pac. 7, as authority for their position. We are of the opinion, however, that the case is not in point. The basis for the holding in that case was that the statute in question, dealing with diking districts, permitted the districts to levy taxes upon the outside property without the consent of the owners thereof, and without giving those persons either vote or voice relative to the imposition of the taxes. In other words, the case held that the statute permitted taxation without representation, and therefore was unconstitutional.

In the case at bar, however, we are confronted with a statute which permits no such a practice as was dealt with in *Malim v. Benthien, supra*. The mere fact that the electors in the district are authorized to condemn the outside property of the private utility company without the electors in the outside territory being able to vote thereon is not comparable to the imposition of taxes, since such persons have no property right in the existing service which they receive from the private utility company. *Paris Mountain Water Co. v. Greenville, supra*.

We are of the opinion that the fact that the condemnation of the property in the outside counties will take that property off the tax rolls of those counties, since property of the districts is not taxable, is too indefinite a matter to constitute a basis for applying the rule of *Malim v. Benthien*. The minute losses which the individual customers might suffer as a result of the removal of the property from the tax rolls would probably be counteracted by savings realized in power rates.

Nor does the fact that the customers in the outside counties would, without voting, no longer have their service and rates regulated by the Washington department of public service constitute a valid reason for holding the statutory authorization unconstitutional, since we cannot assume that the district would perform the service less fairly or reasonably than would be the case if the utility were supplied under the regulations of the department. Obviously, the people of the state, in passing the act in question, showed that they were willing that the public utility districts should supplant the department of public service where systems are condemned, and that such a supplantation would conform with public policy.

For the foregoing reasons, we conclude that Art. I, § 19, of our state constitution would not be violated by permitting the condemnation of the distribution lines outside the condemnor's political boundaries without the residents of the outside counties voting thereon. The effect of such condemnation upon the residents of the outside counties is only incidental, and does not interfere with their property rights, as was the case in *Malim v. Benthien, supra.*

In concluding, we wish to call attention to the fact that respondents have stated in their brief that if we were to permit appellants to condemn the outside lines in the case at bar, it would make it possible for some small county adjoining a large county, such as Spokane county, to condemn the entire power system in the larger county, and to impose its control and management upon the extensive service in the larger county. Respondents contend that such a result would be extremely unreasonable, and should not be permitted. We wish to point out, however, that our holding in the case at bar is confined to the factual situation before us, namely, a situation

in which the outside lines are only incidental to the main portion of the system which is located in the condemnor's boundaries, and that we express no opinion relative to a situation suggested by respondents.

The judgment of the trial court is reversed, with instructions to dissolve the injunction and enter an order of public use and necessity.

ROBINSON, C. J., BEALS, JEFFERS, and MILLARD, JJ., concur.

[1]Reported in 111 P. (2d) 570; 114 P. (2d) 1004.