[1] Reported in 208 P.2d 849.
This proceeding is by way of a writ of certiorari to review the action of the superior court of Chelan county in an eminent domain proceeding.
Action was commenced by public utility district No. 1 of Chelan county (hereinafter called the district) by which it *Page 198 
sought to acquire by condemnation practically all of the property of The Washington Water Power Company (hereinafter called the company), in Chelan county and some of its property in Douglas county. Chelan joint school district No. 129, and the town of Chelan, both municipal corporations, were permitted to intervene in the action.
Demurrers were interposed by the company and the interveners. Application for an order for public use and necessity was brought on for hearing, after which the court overruled the demurrers and entered the order which is the subject of this review.
The property sought to be condemned consists of the transmission lines of the company in Chelan county and some in Douglas county, and the electric generating plant described as the Chelan hydro-electric generating plant, situated on the Chelan river, in Chelan county, and that certain license issued by the Federal power commission, project No. 637, Washington, May 8, 1926, expiring May 8, 1976.
We shall have occasion throughout this opinion to refer to sections of the Federal power act. The entire act is contained in 16 U.S.C. (1946 ed.) § 791 through § 825, and in 16 U.S.C.A., § 791 through § 825. In the interests of brevity, we shall cite the act only by section numbers.
The company relies upon the following points before this court:
"(1) The limitations originally inherent in a license to develop, generate, transmit and distribute hydroelectric power issued by the Federal Power Commission remain restrictions upon a municipality to which the license is transferred by judicial sale.
"(2) Under the statutes of the State of Washington a public utility district does not have the right to condemn a utility property when the system or plan proposed and set forth in the Resolution pursuant to which the right of eminent domain is exercised and instituted, provides that the property shall be paid for by revenue bonds containing covenants repugnant to the United States laws.
"(3) If the Washington statutes re eminent domain proceedings by public utility districts are construed to authorize *Page 199 
condemnation by public utility districts of power projects operated under a license from the Federal Power Commission and payment therefor with proceeds of revenue bonds containing (a) a covenant to maintain rates, and (b) a covenant which is contrary to the provisions of the Federal Power Act for regulation and control of rates by the Federal Power Commission in the absence of regulation of the rates charged by such licensee, they are invalid because they are repugnant to the laws of the United States.
"(4) A public utility district cannot acquire property by condemnation when such property is situated in a county other than that in which is situated the superior court of the county wherein the petition in eminent domain is filed.
"(5) The United States of America is a necessary party to an eminent domain proceeding when a hydroelectric generating property is situated in part on property owned by the United States of America and is owned and operated by a public service corporation under the terms of a license issued by the Federal Power Commission pursuant to the provisions of the Federal Power Act.
"(6) Public interest is a necessary concomitant of public use and when a critical power shortage such as now exists in the State of Washington, and such as existed at the time of the hearing on the application for a Decree of Public Use and Necessity, requires the curtailment of the use of electric power and energy, the greater public use requires that all generating facilities be operated so as to produce the maximum amounts of electric power and energy. That being so, a decree of Public Use and Necessity should be denied a public utility district petitioner in an eminent domain proceeding where the evidence indicates that if the public utility district operates the hyroelectric property sought to be condemned, in such manner as to first make adequate provision for the needs of the district as required by law, the people of the State of Washington will suffer the loss of a very large number of kilowatt hours of electric energy, and said facilities will not and cannot be operated for the greatest public use of the inhabitants of Washington.
"(7) The fact that two municipalities (one of them wholly within, and the other partially within, the geographical limits of a public utility district) will each suffer a large loss of income from taxes and have their respective capacities for incurring bonded indebtedness drastically reduced to a point where their capacities for performing essential services to their respective inhabitants are materially reduced, *Page 200 
by the removal of electrical properties from the tax rolls in the event of the acquisition of such properties by the public utility district, coupled with the fact that the people of the State of Washington will lose a large amount of electrical energy by reason of the operation of such hydroelectric properties in conformity with law by the public utility district, is a matter of such public interest as to affect the question of whether a decree of public use and necessity should be entered, and would make material, relevant, and competent all of the offers of proof by the Town of Chelan, a Municipal Corporation, and by Chelan Joint School District No. 129, a Municipal Corporation.
"(8) The petitioner is not entitled to a Decree of Public Use and Necessity entitling it to acquire by condemnation the generating capacities of respondent, The Washington Water Power Company, a corporation, because petitioner has contracts for an adequate supply of power."
The first three contentions may be considered together. The substance of the company's argument on those points is that the district, as transferee, takes the Federal power commission license subject to all the provisions and limitations contained therein; that one of those provisions vests authority in the Federal power commission to regulate the services rendered and the rates charged by the licensee; that the district's proposed bond issue contains covenants guaranteeing bondholders that the district will maintain rates sufficient to pay the interest and retire bonds as due; that such a covenant denies the right of the Federal power commission to regulate rates and is contrary to the Federal power act in that it is an agreement to fix or maintain rates.
The license to construct and maintain the Chelan dam was originally issued by the Federal power commission to the Chelan Electric Company, which, with the consent of the commission, assigned its right to The Washington Water Power Company. Article 28 of that license, the provision in question here, provides in part:
"Article 28. The Licensee shall abide by such reasonable regulation of the services to be rendered to customers or consumers of power, and of rates and charges of payment therefor, as may from time to time be prescribed by any duly constituted agency of the State in which the service is *Page 201 
rendered or the rate charged; and in case of the development, transmission, distribution, sale or use of power in public service by the Licensee or by its customers engaged in public service within a State which has not authorized and empowered a commission or other agency or agencies within said State to regulate and control the services to be rendered by the Licensee or by its customers engaged in public service, or the rates and charges of payment therefor, or the amount or character of securities to be issued by any of said parties, it is agreed as a condition of this license that jurisdiction is hereby conferred upon the Commission, upon complaint of any person aggrieved or upon its own initiative, to exercise such regulation and control until such time as the State shall have provided a commission or other authority for such regulation and control. . . .Provided, That the jurisdiction of the Commission shall cease and determine as to each specific matter of regulation and control prescribed in this Article as soon as the State shall have provided a commission or other authority for the regulation and control of that specific matter."
The inclusion of this article stems from § 812 of the Federal power act, which provides:
"As a condition of the license, every licensee under this chapter which is a public-service corporation, or a person, association, or corporation owning or operating any project and developing, transmitting, or distributing power for sale or use in public service, shall abide by such reasonable regulation of the services to be rendered to customers or consumers of power, and of rates and charges of payment therefor, as may from time to time be prescribed by any duly constituted agency of the State in which the service is rendered or the rate charged. That in case of the development, transmission, or distribution, or use in public service of power by any licensee under this chapter or by its customer engaged in public service within a State which has not authorized and empowered a commission or other agency or agencies within said State to regulate and control the services to be rendered by such licensee or by its customer engaged in public service, or the rates and charges of payment therefor, or the amount or character of securities to be issued by any of said parties, it is agreed as a condition of such license that jurisdiction is hereby conferred upon the commission, upon complaint of any person aggrieved or upon its own initiative, to exercise such regulation and control *Page 202 
until such time as the State shall have provided a commission or other authority for such regulation and control: Provided, That the jurisdiction of the commission shall cease and determine as to each specific matter of regulation and control prescribed in this section as soon as the State shall have provided a commission or other authority for the regulation and control of that specific matter." (Italics ours.)
By resolution No. 51, the district sought to acquire the properties in question. The resolution set up a plan for the acquisition at an estimated cost of ten million dollars, to be financed by the sale of revenue bonds, and created a special fund to be known as the "Serial Electric Revenue Bond Fund." The district obligated and bound itself irrevocably to pay into that fund out of the gross revenues such amount as may be necessary to pay the principal on the bonds as they mature. It also bound itself to establish and maintain rates sufficient to provide revenues to permit the payment of funds into the special fund for the payment of bonds, interest, and all costs of operation.
It is the contention of the company that the district is not a regulatory agency of the state, and therefore, the plan to issue revenue bonds, containing an agreement to maintain or increase rates as an integral part of the plan of operation, is contrary to article 28 of the license and § 812 of the act, in that it is an interference with the reserved right of the Federal power commission to regulate rates and charges of a licensee.
On the other hand, the district contends that it is a duly constituted agency of the state, clothed with delegated authority from that sovereignty to regulate and control rates and services, and therefore free from Federal regulation under the provisos to article 28 of the license and § 812 of the act. This theory is based upon Rem. Supp. 1945, § 11610-(d) [P.P.C. § 833-11] which authorizes public utility districts to sell electric current "for all uses, with full and exclusive authority to sell and regulate and control the use, distribution, rates, service, charges, and price thereof free *Page 203 
from the jurisdiction and control of the Director of Public Works and the Division of Public Utilities."
[1] Our first problem, therefore, is to determine whether the state delegated power to the public utility districts to regulate rates within their borders, so as to constitute them agencies of the state, or whether it abrogated such power to them. From an examination of Rem. Supp. 1945, § 11610 (d), it is obvious that the state did not delegate power to the public utility districts to act for it in the regulation of rates. The legislature created these municipal corporations and simply said that, as to such districts, there will be no such regulation whatsoever. Hence, the districts, at least in those matters set forth in the above statute, are neither agencies of the state nor answerable to the state; they are "full and exclusive" authorities within themselves.
Does this absence of state regulation open the door to Federal intervention, as the company contends? Turning again to the Federal power act, we note under § 812 that only the following are subject to regulation by the Federal power commission:
". . . every licensee under this chapter which is a public-service corporation, or a person, association, or corporation owning or operating any project . . . for sale or use in public service."
Section 796 (3) of the act defines "corporation" as follows:
"(3) `corporation' means any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, or a receiver or receivers, trustee or trustees of any of the foregoing. It shall notinclude `municipalities' as hereinafter defined;" (Italics ours.)
Section 796(7) defines "municipality" as follows:
"(7) `municipality' means a city, county, irrigation district, drainage district, or other political subdivision or agency of a State competent under the laws thereof to carry on the business of developing, transmitting, utilizing, or distributing power;" (Italics ours.)
Section 797 (e) authorizes the commission:
"To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized *Page 204 
under the laws of the United States or any State thereof, or toany State or municipality for the purpose of constructing, operating, and maintaining dams, . . ." (Italics ours.)
Section 807 expressly reserves:
". . . the right of the United States or any State or municipality to take over, maintain, and operate any project licensed under this chapter at any time by condemnation proceedings upon payment of just compensation . . ."
[2] We are of the opinion that it was the purpose of Congress, under § 812, to confer jurisdiction upon the commission to regulate rates of licensees which are public servicecorporations and that it was not the intention to confer jurisdiction to regulate rates of licensees which are municipalities. Throughout the act is evidenced a determination to recognize the independence of the states from domination or encroachment by the Federal government. In construing this intent of the act the supreme court of the United States declared, inFirst Iowa Hydroelectric Co-op. v. Federal Power Commission,328 U.S. 152, 171, 90 L.Ed. 1143, 66 S.Ct. 906:
"We find that when that Act is read in the light of its long and colorful legislative history, it discloses both a vigorous determination of Congress to make progress with the development of the long idle water power resources of the Nation and a determination to avoid unconstitutional invasion of the jurisdiction of the States. The solution reached is to apply the principle of the division of constitutional powers between the State and Federal Governments. This has resulted in a dual system involving the close integration of these powers rather than a dual system of futile duplication of two authorities over the same subject matter."
In the same opinion the court quoted the remarks of Representative William LaFollette of Washington in the House debates on the power act:
"`We are earnestly trying not to infringe the rights of the States. If possible we want a bill that can not be defeated in the Supreme Court because of omissions, because *Page 205 
of the lack of some provision that we should have put in the bill to safeguard the States.' 56 Cong. Rec. 9810.
"As indicated by Representative LaFollette, Congress was concerned with overcoming the danger of divided authority so as to bring about the needed development of water power and also with the recognition of the constitutional rights of the States so as to sustain the validity of the Act. The resulting integration of the respective jurisdictions of the State and Federal Governments is illustrated by the careful preservation of the separate interests of the States throughout the Act, without setting up a divided authority over any one subject."
See, also, Connecticut Light Power Co. v. Federal PowerCommission, 324 U.S. 515, 89 L.Ed. 1150, 65 S.Ct. 749; ReNebraska Power Co., 62 P.U.R. (N.S.) 276.
We are not unmindful of § 801 of the act, which provides:
". . . any successor or assign of the rights of such licensee, whether by voluntary transfer, judicial sale, foreclosure sale, or otherwise, shall be subject to all the conditions of the license under which such rights are held by such licensee and also subject to all the provisions and conditions of this chapter to the same extent as though such successor or assign were the original licensee under this chapter: . . ."
We feel that the above section would bind the district as to provisions such as a limitation on the amount of water to be appropriated, etc., but that it would not give the commission the power to regulate rates of a municipality. It would bind the assignee only as to those provisions to which it could have been subjected had the assignee been the original licensee, and if such a licensee is a municipality, the commission has no authority to regulate its rates.
[3] As grounds for its contention that the proposed bondissue contract is "repugnant to the laws of the United States," the company relies upon section 803 (h), which provides:
"(h) Combinations, agreements, arrangements, or understandings, express or implied, to limit the output of electrical energy, to restrain trade, or to fix, maintain, or increase prices for electrical energy or service are hereby prohibited." *Page 206 
That section was enacted for the sole purpose of prohibiting monopolistic combinations, agreements, etc. It is the "anti-trust" section. For example, an agreement by The Washington Water Power Company, the Puget Sound Power Light Company, and the Chelan P.U.D. to limit the output of electrical energy, or to restrain trade, or to fix, maintain, or increase prices for electrical service to the detriment of consumers would be prohibited. But it was not the intention of the provision in question to prohibit an agreement between the district and its bondholders that the district would maintain rates to pay the principal and interest of the bonds. Furthermore, as we have stated previously, by becoming the assignee, the district does not ipso facto become subject to jurisdiction by the commission. Admitting arguendo that the commission could exercise jurisdiction to regulate rates, there is nothing in the record that "upon complaint of any person aggrieved or upon its own initiative," the commission will ever exercise such regulation, or that it would not take into consideration the cost of operation and also the cost of purchasing the facility.
[4] Therefore, as to the first three contentions of the company, we find nothing in the proposed revenue bond plan of the district contrary to the limitations imposed by United States law upon a municipality which is the assignee of a license of the Federal power commission.
[5] Passing to a consideration of point No. 4, the testimony shows that the area now served by the company in Douglas county, and covered by its distribution system, is confined to the banks of the Columbia river for approximately ten miles. It is devoted to orchards and serves only ten users. We held in Carstens v.Public Utility Dist. No. 1, 8 Wn.2d 136, 111 P.2d 583, that a public utility district could condemn a portion of a distribution line lying in a county outside the district when the effect of such taking is only incidental. We are satisfied from the record here that the taking of the distribution lines in Douglas county is merely incidental to the taking of the Chelan county property, and hence, permissible. *Page 207 
 [6] We find no merit in the fifth contention, that the United States is a necessary party to this proceeding. No property of the United States is sought to be taken. Furthermore, the company has no right to complain that others having some interest in the land are not made parties. Delfeld v. Tulsa, 191 Okla. 541,131 P.2d 754, 143 A.L.R. 1032.
Nor is there any merit in the company's sixth point, the contention that the critical power shortage in the northwest would be intensified because the district would not be able to join the Pacific northwest power pool. The testimony shows that the pool was organized in 1941. Its purpose was to obtain the maximum power available during the war, and it was sponsored by the war production board and the Federal power commission. The members are: Idaho Power Company, Utah Power Light Company, Montana Power Company, The Washington Water Power Company, Puget Sound Power Light Company, City of Seattle, City of Tacoma, Bonneville Power Administration, Pacific Power Light Company, and Portland General Electric Company.
Marshall L. Blair, superintendent of operations of The Washington Water Power Company, testified that the pool is primarily a coordination of operation, which includes such things as the stream flow, reservoir elevations, proper loading of plants at some given time to satisfy certain loads, transmission flows of power, coordination of breakdown, and coordination of maintenance. The power shortage has increased since the war, and will continue until at least 1953. Under this arrangement the Chelan plant has been shut down during the spring months to permit the storage of water, and the power has been obtained from other sources of the pool.
The company contends that the district cannot legally become a member of the pool, and that to permit the district to take over the Chelan plant would result in a distinct loss of power to the people of the northwest. It was admitted that there was no physical reason why the plant could not be operated by the district within the pool. It should be *Page 208 
noticed that the cities of Seattle and Tacoma are members of the pool. The question of the legality of a public utility district becoming a member of the power pool is not before us. If such a question should arise, legislation could, if thought advisable, be enacted to permit the districts to join the pool. Furthermore, the testimony shows that, at the time of the hearing, the district was in the process of entering into a twenty-year contract with the Bonneville administration for the sale of power. By purchasing such power from Bonneville during any critical periods, the same result obtained by joining the pool would be accomplished. In addition, even though there would be a distinct loss of power to the people of the northwest, the people of the state have decreed that they shall have the right to condemn and take over the facilities of the private power companies. It is not within the province of the courts to question the advisability, the cost, or the resultant loss of power due to such action.
As to the final contention of the company, the intervener school district offered to prove that the total values of property within the district are $6,435,118, and that the value of The Washington Water Power property therein is $3,243,608; that the total ad valorem property taxes of the district would be $83,656.53, and that the taxes to be paid by the company would be $42,166.90, which would result in a loss to the district in the amount of $42,166.90; that the loss could be compensated for only by special levies, which are difficult, if not impossible, to obtain because of the statutory requirement that 40 per cent of the voters in the last gubernatorial election must vote in such special election; that the district now has outstanding bonds in the amount of $235,000; and that there was a 32 mill levy made in 1947 and paid in 1948.
Intervener town of Chelan offered to prove that the total assessed valuation of the town is $2,099,223; that the value of The Washington Water Power property within the town is $898,456; that the total ad valorem taxes of the town would be $31,568.71 and that the taxes to be paid by the company *Page 209 
would be $13,512.69, with the resultant loss to the town in that amount.
[7] These offers of proof were refused by the trial court on the ground that the matter of the loss of revenue to a municipality is not a legal ground for refusing the public utility district the right of eminent domain. It is unfortunate that these municipalities might lose much needed revenue because of the condemnation of this property by the district, but that is a matter for the concern of the legislative branch of the government, rather than of the judicial branch. Municipalities, as such, have no inherent right of taxation. They derive their right to raise revenue from the state, and what the state has given, the state can take away.
In Gasaway v. Seattle, 52 Wn. 444, 100 P. 991, 21 L.R.A. (N.S.) 68, it was held that, when a city of the first class acquired real estate by exercise of its power of eminent domain, the county could not thereafter enforce a prior tax thereon, even though the county had not been made a party to the eminent domain proceedings. In significant language, this court said:
"All taxes are levied under the express or implied power of the state. The state can fix the subject of taxation and exempt property. It can limit or extend the time of payment. The authority so delegated, when exercised, is none the less the execution of the state's power. If it can do all these things, it can take away not only the power to tax but the subjects of taxation as well. No person or municipality can acquire, as against the state, a vested right to taxes, or the right to insist upon the collection of taxes when levied."
But though the state has taken away a primary source of revenue of these taxing districts, it has created a new source which, to a large extent, will compensate for such loss. Realizing the consequent loss of revenue to various taxing districts by the withdrawal from their tax rolls of property condemned by a public utility district, the legislature has enacted so-called "in lieu" taxes; we refer to Rem. Supp. 1941, § 11616-2 [P.P.C. § 833-53], which was amended by the Laws of 1947, chapter 259, § 2, p. 1079, and by the Laws of 1949, chapter 227, § 2, p. 799. This measure levies a tax, *Page 210 
similar to the "occupation tax" that most businesses pay, on the gross revenues of all public utility districts and apportions the receipts among the taxing districts within their boundaries on the basis of former levies upon the fair value of property withdrawn from their tax rolls. Thus, it is problematical whether or not the interveners here would sustain any actual loss of revenue.
The judgment of the trial court is correct, and its order of public use and necessity is affirmed.
JEFFERS, C.J., BEALS, ROBINSON, MALLERY, HILL, and GRADY, JJ., concur.