John BRIDAL and Mrs. Roger Murphy, Owners of Land Within the Boundaries of Conservancy District No. 11, Appearing as Individuals and as Officers and Members of the L. O. C. K. Protection Association, on *their own behalf as Individuals and on behalf of all other Land Owners Similarly Situated*, and Helen Hilpirt, Plaintiffs in Error,

v.

COTTONWOOD CREEK CONSERVANCY DISTRICT NO. 11, IN LOGAN, OKLAHOMA, KINGFISHER AND CANADIAN COUNTIES, State of Oklahoma, Defendants in Error.

No. 40716.

Supreme Court of Oklahoma.

June 29, 1965.

Stuart H. Russell, Oklahoma City, for plaintiffs in error, John Bridal and Mrs. Roger Murphy, as Individuals and as Officers and members of the L. O. C. K. Protection Ass'n.

Leslie L. Conner, James M. Little, Leslie L. Conner, Jr., Oklahoma City, for plaintiff in error, Helen Hilpirt.

George F. Short, Gerald A. Karam, Pierce, Mock, Duncan, Couch & Hendrickson, Oklahoma City, for defendants in error.

James C. Hamill, Oklahoma City, for amicus curiae Landowners Protective Ass'n of State of Oklahoma.

Allen G. Nichols, Wewoka, for amicus curiae Oklahoma Ass'n of Soil & Water Conservation Districts.

Ed R. LeForce, Idabel, David C. Matthews, Perry, Wayne Russell, Wilburton, Chilton Swank, Stillwater, and Robert W. Blackstock, Bristow, for amici curiae Whitegrass-Waterhole Flood Control & Soil Conservancy Dist., Fourche-Maline Creek Conservancy Dist., Black Bear Conservancy Dist., Stillwater Creek Conservancy Dist. No. 16 and Little Deep Fork Water & Soil Conservancy Dist. No. 1.

BLACKBIRD, Justice.

This case involves the creation, and certain operations, of Cottonwood Creek Conservancy District No. 11, which will hereinafter be referred to merely as the "District".

As described in its petition for creation that was filed in this court in November, 1957, the District was to include lands in Cottonwood Creek's watershed that are located in Canadian, as well as Logan, Oklahoma and Kingfisher Counties. One of the parties signing the petition was the plaintiff in error, Helen Hilpirt, hereinafter referred to by surname only. She resides, and owns land, in Oklahoma County, as well as in the Logan County part of Cottonwood Creek's watershed. As to that part of the proposed district land that is located within the city limits of Guthrie, the Mayor of said City, rather than the owners of said property, signed the petition.

After this court, pursuant to a provision of this State's Conservancy Act (Tit. 82 O.S.1951, § 542, as amended, S.L., 1957, pgs. 555 & 556) determined by its order of November 12, 1957, that the District Court of Logan County was the most convenient district court for the hearing of the petition, it was filed in that court. Notice of said petition was given by publication in newspapers published in all four of the counties into which the proposed district was to extend, those of Oklahoma County being published at Edmond, Oklahoma.

Thereafter, in January, 1958, more than 25% of the owners of the Canadian County land embraced in the proposed district filed a pleading entitled "OBJECTION AND PROTEST TO THE ORGANIZATION AND INCORPORATION OF SAID DISTRICT".

At the hearing held January 10, 1958, on the petition, and the protest, no evidence was introduced as to what percentage of the landowners of any of the counties in

the proposed district had signed the petition for its establishment, the court accepting, in lieu thereof, an oral statement made in open court and in the presence of some of the protesting landowners, by one of the attorneys for the proponents. When, during the testimony of the second witness sworn, a Mr. Specht, it appeared and was conceded, that the owners of more than 25% of the Canadian County land had signed the objection and protest, the court ruled this was sufficient to keep Canadian County from being included in the proposed conservancy district. When, upon a motion made by a representative of the Canadian County owners, said owners' protest to the creation of the district were dismissed *as to the other counties* included in the district petitioned for, the court said:

"Now, that leaves Kingfisher, Oklahoma and Logan Counties and there is no protest in writing on file.

"Now, * * * the Court is going to interpret the Act * * * as to mean * * * that *the Court has authority to form the district as it applied to three counties* and *let the one out that has protested.* But I am frankly going to state that some attorneys and other courts might disagree with me on this, * * *. But * * *, after reading the Act from one end to the other, * * * I interpret it that *the Court does have authority to create the district less that county that has filed a protest,* and that will be the order of the Court and the district is ordered created as Conservancy District No. 11 of the State of Oklahoma." (Emphasis added).

Thereupon, by journal entry dated the same day (January 10, 1958) the court entered its order sustaining the protest as to Canadian County land by striking said land from the proposed District and from the petition for its creation, and creating a conservancy district out of the Logan, Kingfisher and Oklahoma County lands described in said petition. The order also gave

said district its present corporate name, designated Guthrie for the location of its office and principal place of business, and appointed C. E. Tribble of Logan County, Connie White of Kingfisher County, and C. E. Bretz, a civil engineer of Oklahoma County, as directors of said Conservancy District.

After the court had subsequently made several deletions of Oklahoma County land from the District, upon motions of said District Corporation's Board of Directors, C. E. Tribble (who had been elected president of said Board) on December 6, 1962, filed in the District Court proceedings, an application for approval of "PLAN FOR WORKS OF IMPROVEMENT" for the District, a copy of said Works Plan being attached to said application. Pursuant to, and upon the filing of, said application, the court, on the same day, ordered said application set for hearing on January 15, 1963; and a notice of said hearing, issued by the Clerk of the Court, was filed in the proceedings on December 11th. Among other things, the notice stated that all persons desiring to do so, might inspect the Works Plan on file in the Clerk's office, and that all objections to it had to be in writing, and filed in said Clerk's office, before 10:00 o'clock A. M., on January 15, 1963. There is evidence that this notice was published in El Reno, Guthrie, and Edmond newspapers once each week, for three consecutive weeks, beginning December 13, 1962, and, on the basis of uncontradicted representations in the briefs, we take it that it was also published in Kingfisher County.

Thereafter, on January 7, 1963, plaintiffs in error, John Bridal and Mrs. Roger Murphy, filed in the conservancy district proceedings a motion (on behalf of themselves and "other landowners *within* the proposed district similarly situated * * * ") for a continuance of the hearing in order to allow them "to file written protests and to present objections to the approval * * * of the Works Plan and specifications." This motion was overruled on January 11, 1963, and an exception allowed.

Thereafter, on January 15, 1963, Messrs. Stone and Specht joined other owners of Canadian County land in filing a pleading entitled: "OBJECTION"; the owners of land in other counties, including Hilpirt, filed various protests to the Works Plan and Specifications; and Bridal and Mrs. Murphy joined in a separate filing entitled: "PROTEST", in which they asserted, in fourteen separately numbered paragraphs, various objections to the Plan and proceedings. In the first of these paragraphs, said protestants charged that the Works Plan and Specifications constituted a "complete deviation from the policies and purposes for which Conservancy District No. 11 was formed, and are contrary to the provisions of Title 82 Oklahoma Statutes Annotated 531, et seq., and constitute a fraud upon the landowners within the proposed district who were induced to support, or not to object, to the original formation of Conservancy District No. 11."

The proceedings next came before the court the same day at a pre-trial conference at which Stone's motion, in so far as it asked that the Canadian County land be removed from the Works Plan, was found to be moot, and said motion, in so far as it pertained to striking said Plan, was overruled; and hearing on the Plan's approval was postponed to February 11, 1963. At another pre-trial conference on the latter date, *the hearing was again postponed until March 19, 1963, partly because it appeared that the protestants hadn't had "sufficient time to make a detailed investigation of the proposd Plan."* On the latter date, the matter was again re-set for further pre-trial on April 18, 1963, and the trial on the proposed Works Plan was re-scheduled for April 23, 1963.

On April 18, 1963, there was a document filed in the proceedings denominated "PRE-TRIAL STIPULATION AND ORDER" signed by the trial judge, in which the court found, in substance, that the owners of *a majority* of the land in the District had not protested, or objected, to the Works Plan as a whole, and therefore the District

should not be dissolved. As evidenced by this instrument, the court also ordered the prospective hearing to be confined to objections filed by the owners of land *in* the District. In the same order, rulings and stipulations were made upon all fourteen of the objections asserted in the hereinbefore mentioned "PROTEST" of Bridal and Mrs. Murphy, with exceptions being allowed them to all adverse rulings.

At the beginning of the trial on April 23, 1963, the protestants orally challenged the jurisdiction of the court, but this was overruled. After the court had heard testimony pro and con of the merits of the Works Plan, the attorney for Bridal and Mrs. Murphy, and also Hilpirt's attorney, obtained proponents' counsel's assent to entering into a stipulation that no legal process had been served upon their client *other than* "the publication service" and/or "process". Testimony elicited on behalf of the Plan's proponents was contemplated to show its feasibility, as approved by the Conservancy District's corporate organization. The Plan called for the construction of flood water retarding structures, or dams, on 58 consecutively numbered sites in the four counties *originally within* the boundaries of the District. (In referring to them herein, the dams are given the same number as their sites). At the close of the evidence, protestants challenged the jurisdiction of the court to order the Plan adopted, and, in connection with said challenge, made a lengthy, written offer of proof. After this challenge, a motion to dismiss, and a demurrer to proponents' evidence (all interposed by protestants) had been overruled, the protestants introduced further evidence contemplated to show, among other things, that, independently of Canadian County, there were substantial areas of land in Oklahoma, Kingfisher and Logan Counties that would be benefitted by the Plan, but were *not* included within the boundaries of the District.

At the close of the evidence, the court, on the same day (April 23, 1963), entered its order approving and adopting the Works

Plan. Thereafter, protestants' motions for a new trial were overruled, and they gave notice of appeal to this Court in May, 1964.

Later, after a decision by the District's Board of Directors to build the structures referred to herein as dams numbered 16, 17 and 18, bids for construction were advertised in El Reno and Kingfisher newspapers for 3 consecutive weeks, beginning July 30, 1964. Thereafter, protestant Bridal, on August 27, 1964, filed in the conservancy proceedings, an "APPLICATION" in which he asked the court to review the advertising for bids and other steps taken for awarding the contracts, and further alleged:

> "In support of this application, applicant alleges that the notice calling for bids was not published in the manner required by 82 O.S.A. 569, and that the letting of contracts for the construction of dam sites #'s 16 and 17 located in Canadian County, Oklahoma, is outside the scope of the authority of the Board of Directors of Conservancy District No. 11, since Canadian County is not included within the Conservancy District, and there is land in Canadian County which will be benefitted as a result of the proposed construction of dam sites #'s 16 and 17, and which cannot carry any share of costs accruing to the District.

> "Applicant further alleges that this will damage him and other owners of benefitted land within the District by creating a greater and an unequal tax burden as a result of the illegal action of the Board of Directors in connection with these contracts."

The filing of Bridal's application was followed, approximately a month later, by the filing of a "PROTEST" by parties named Washecheck, Gossett, Simpson, and Eades, in which they alleged, in substance, that they were the owners of an undivided 80-acre interest in the minerals under a certain described tract of land in Canadian County; that the owners of said tract's surface, and surface rights, had granted the District an easement over it for the construction of a dam on site No. 16; that the construction of such a dam "would be in derogation of their right of ingress and egress * * *", would substantially decrease the value' of an oil and gas lease on their property, and would deprive them of valuable property rights without compensation and without due process of law.

At the court hearing on the above described application and protest, it was stipulated, among other things, that contracts had been let for the construction of the three dams above referred to (Nos. 16, 17 and 18), but that contract-signing by the District had been deferred because of the filing of Bridal's application. It was further stipulated that the *proposed sites of dams numbered 16 and 17 were in Canadian County,* that the site for dam No. 18 was in Kingfisher County, and that the cost of constructing all three dams will be paid by the United States government, with any maintenance, or other "potential", costs shown on the Works Plan and Specifications to be "* * * assessed against the owners of *benefitted* land *within* the District." (Emphasis added).

At the close of the hearing, the court, on September 25, 1964, entered its order approving the action of the District's Board of Directors in obtaining bids, and letting contracts, for the construction of dams numbered 16, 17 and 18, and finding to be without merit, Bridal's allegations that such action was beyond the proper scope of said Board's authority, and would damage him by placing "a greater or unequal tax burden" upon him.

After being advised by the attorney for the above named mineral owners that their mineral interest is only in the tract of land selected for dam site No. 16, and that they own no surface rights in any land within the District's boundaries, the Court, in a supplemental decision of October 9, 1964, reciting that the parties had stipulated that Washecheck, Gossett, Simpson, and Eades "* * * are not the owners of an interest in real property in the land included within

the presently described boundaries of the Cottonwood Creek Conservancy District; * * *", ruling that they were not "interested tax payers as contemplated by 82 O.S.A. 569", and dismissing their protest on the latter ground.

In the petition in error plaintiffs in error, herein referred to by name, or as "protestants", filed in this court, during October, 1963, they complained only of alleged errors in the conservancy district proceedings prior to the court's order of April, 1963, approving the Conservancy District's Works Plan, and its order overruling their motion for a new trial. Later, in December, 1964, they filed in this same appeal, a second casemade reflecting the proceedings of the lower court after new trial was denied; and, in what is termed a "Supplemental Appeal", they now complain also of the lower court's order of September, 1964, approving the Conservancy District Board's actions to accomplish construction of dams numbered 16, 17 and 18.

■ In protestants' first argument for reversal, they charge that the lower court, hereinafter referred to as the "trial court", lacked jurisdiction to create the present Conservancy District, as it purported to do by its order of January 10, 1958. One argument advanced in support of this position is, in substance, that since the petition, invoking the court's statutory jurisdiction to act, proposed creation of the district out of land in *four* counties—rather than *three* —the court was powerless to create a district consisting of land in *only three* counties. There is no merit to this argument. Section 542, supra, specifically provided that: " * * * no more than three-fourths (¾) of the number of counties proposed to be * * * incorporated * * *" in such district " * * * need to be so represented on such petition; * * *." We hold that this provision authorized the trial court to establish a "three-county" district although the petition proposed one extending into four counties, and notwithstanding the provision in sec. 545, Tit. 82, supra, that the court's decree "shall designate the

general description of the outline of said district *substantially as set out in petition* * * *" (Emphasis added).

■ Protestants also challenge the trial court's jurisdiction on the ground that the proponents made no evidentiary showing that 25% of the owners of land in the three counties, into which the district (as presently constituted) extends, signed the petition for its creation. They point out that the provision in Section 542's first paragraph, pertaining to proposed districts affecting only one county, whereby the signature of the mayor of a city on such a petition may be accepted " * * * in lieu of one-half of the number or percentage of the ownership of land required to sign the petition", is not repeated, referred to, or contained, in said section's second paragraph, which pertains to districts which (like the present one) affect " * * * two or more counties * * *". Later, in their argument, protestants say, in substance, that, assuming that the statutory provision in question applies alike to proposed districts affecting two or more counties, as well as to those affecting only one county, it would still be necessary for the court to know the number of city property owners having land located within the proposed district's boundaries, in order to determine whether 25% of the owners in the same county had signed the petition; then they make this representation: "Analysis of the tax receipts would establish that neither the 25 per cent nor the 51 per cent requirement of land owners' signatures had as of January 10, 1958, in fact been obtained in Logan County." (In this connection, notice In Re Conservancy District No. 37, Okl., 398 P.2d 525, 528). Protestants charge that the trial court erred in refusing to permit them to introduce evidence showing that the court lacked jurisdiction. This latter statement infers that protestants, at some time during the proceedings, offered, but were denied the opportunity, to prove that the Logan County owners signing the petition constituted less than 25% of all Logan County owners

having land in the district. The record, however, does not support this inference. We have carefully examined both the case-mades filed herein, and have been unable to discover that protestants, at any stage of the proceedings, offered to prove that the signers of the petition constituted *less than* 25% of the owners of land in the parts of the proposed district, located in either Logan County, Kingfisher County, or Oklahoma County.

Nor do we think the fact that the proponents never formally introduced evidence to affirmatively establish this percentage requirement, relieved protestants of the necessity of making such an offer, in order to lay a predicate for their present arguments. Although the last paragraph of Section 542, supra, in referring to tax duplicates, provides that they shall be prima facie evidence of land ownership in " * * * determining when a sufficient number of landowners have signed the petition, * * * ", this provision applies only when the introduction of evidence is necessary. It did not require the introduction of tax duplicates in situations where, under the circumstances, the introduction of evidence might properly be deemed unnecessary. In our opinion, the record in this case indicates that the trial court had such a situation before it, when, at the beginning of the hearing of January 10, 1958, on the petition for the establishment of the district (and the protests previously filed against it) material portions of the subject Conservancy Act were read aloud in the presence of representatives of both the protestants and proponents, and the trial judge then made the following announcement:

"If no one requires any other parts of the Act to be read, the Court will now take up the question of the sufficiency of the petition in the initial instances, and the Court now inquires, there being more than two counties involved, does the petition show that in at least three of the counties 25% or more of the persons owning area in each of the counties have signed this petition?

\*     \*     \*     \*     \*     \*

"THE COURT: * * * the Court inquires, without going into it and having everyone produce tax receipts, is there any question but what the tax duplicates will show that 25% of the people owning land in the area described have signed this petition?

"MR. MOSER: Well, let me just say this, that in preparing the petition the names taken from the tax duplicates in each county were connected directly to the ownership as shown in the proposed Conservancy District and their names were inserted on the petition, and more than 25% are shown as signing the petition.

"THE COURT: Then, unless there is a protest as to this exact point, the Court will take that statement as evidence that there are 25% of the property owners in area as signing.

\*     \*     \*     \*     \*     \*

"The Court now finds, then, that 25% having signed it and notice having been given, that the matter is now ready to be heard by this Court, and the first thing the Court wants to hear will be in the order established here: First, does the proposed plan subserve the purposes of the Act, and on that matter the Court would request some testimony. * * *"

As no one present at the hearing, though given the opportunity to do so, challenged, or contradicted, the above quoted representation of Mr. Moser, attorney for the proponents, we think the trial court was warranted, in the exercise of his judicial discretion and judgment, in dispensing with the formal introduction of evidence to support that representation. As far as can be ascertained from the record, there was at least tacit agreement by all of those present that Mr. Moser's statement was correct; and we have no doubt but that if the existence of a plausible dissent to it by any interested party present had been indicated, the Honorable Trial Judge would have required said representation to be further verified, or supported by proof.

■■ We are also of the opinion that, after entry of the trial court's judgment of January 10, 1958 creating the Conservancy District, anyone contradicting its ruling that it possessed jurisdiction in the matter, had the burden of establishing the truth of his claim. Sec. 545, supra, provides, in part:

" * * * After an order is entered establishing the district, such order shall, unless appeal be taken within ninety days, *be deemed final and binding upon the real property within the district, and shall finally and conclusively establish the regular organization of the said district,* except as to jurisdictional questions, against all persons, except the State of Oklahoma upon suit commenced by the Attorney General. Any such suit by the Attorney General must be commenced within ninety (90) days after said decree declaring such district organized as herein provided, and not otherwise. *The organization of said district shall not be directly or collaterally questioned in any suit, action or proceeding except as herein expressly authorized,* except as to jurisdictional questions." (Emphasis added).

Despite allegations which protestants made, as early as January 15, 1963, in their hereinbefore mentioned "Protest", and representations contained in the written offer of proof they made at the trial on April 23, 1963, to the effect that the assent of some landowners to creation of the District was obtained by fraudulent misrepresentations as to the character of the Works Plan to be undertaken by the proposed district, and to the further effect that many such owners would have filed protests to the approval of the Works Plan (that the District later approved, proposed, and filed) had they known within the allowable time for filing protests, what the Plan contemplated and/or entailed, Protestants never offered to prove that the signers of the petition comprised less than 25% of the owners of land of either of the three counties and within the proposed District's boundaries (though their

"Supplemental Brief * * * (p. 13)" represents they did), or that a sufficient number of disenchanted, or so-called "defrauded" owners, (originally signing the petition) desired (after the filing and "unveiling" of the Works Plan) to object to it, that the remainder was less than that percentage, or less than a majority of those owning land in the District. On the other hand, at the hearing on the District's petition for approval of the proposed Works Plan, which, after repeated postponements, as hereinbefore indicated, was finally held April 23, 1963, Mr. Russell, attorney for the protestants made the concession shown in the following excerpt from the record:

"MR. RUSSELL: * * * I would like to offer some additional Protests which happen to be in my possession and which were signed by landowners within the watershed and within the District—within the benefitted area as shown by the district, which were not available by January 15th, the date on which the Court cut off the filing of protests. I would like to make an offer of those just for the purpose of showing the additional ones that have been secured since that time.

"MR. SHORT: To which we would object for the reason that within the time provided by law these Protests were not filed upon due notice having been given as provided by law and within the time provided in said notice, and that these Protests nor this offer have any standing.

"THE COURT: Let me inquire, have you in mind the District and not the watershed? Would the ones already on file and these constitute in excess of 50% of the land area in the District?

"MR. RUSSELL: The ones on file coupled with the ones in my possession this morning we will stipulate *do not constitute 51% of the landowners within the District* as delineated.

"THE COURT: Then the objection to the filing of them for consideration

will be sustained, with exceptions, but I will hand them to the Clerk to be marked as late-filed Protests, and for the benefit of reducing the record in the event of an appeal * * *" (Emphasis added).

Tit. 82 O.S.1961, § 565, provides in part:

"All objections to said plan shall be in writing and be filed with the said court clerk on or before the date of hearing fixed in said notice, provided, however, that the court, for good cause shown, shall have authority to extend the time for filing said objections in its discretion. If at said date *the owners of a majority of the area of land in the said district shall* file a *protest* and objection to the plan as a whole, then the court shall order an assessment of the properties in said district sufficient to pay the cost of the proceedings up to said time, said costs to be fixed by the court, and to be prorated equally upon the property included in said district, provided, however, that no assessment for said purpose shall be more than twenty cents (20¢) per acre on agricultural lands. Upon the collection of said assessments the court shall order said district dissolved. If said district be not dissolved by the court, the court shall hear said objections and adopt, reject or refer back said plan to said Board of Directors. * * *" (Emphasis added).

In the absence of any claim to the contrary, we think it may be reasonably and correctly concluded from the above-quoted statement of the protestants' attorney that even with the opportunity afforded by the Court's hereinbefore mentioned previous orders postponing to April 23, 1963, the hearing on the District's proposed Works Plan, "* * * the owners of a majority of the area of land in the said district * * *" (sec. 565, supra) had not, as of that late date, seen fit to protest, or object, to said Plan. It follows therefore that in proceeding with the April 23rd trial on the merits of the Plan (rather than ordering the District dissolved) the trial court—from the standpoint of number of protests to the proposed Plan—was merely following the wording of the above-quoted statute. Furthermore, as might be guessed by our references to the Court's apparent willingness to consider any and all protests, whether filed within the time prescribed in the notice, or presented as late as April 23, 1963—provided only that the aggregate number thereof met the requirement of the statute—we are not persuaded that the court abused his discretion, or committed error prejudicing protestants, when, on January 11, 1963, he originally overruled their motion for a continuance to present objections to the Plan. Although protestants complain of the insufficiency of the period before January 15, 1963, (during which the Christmas and New Year's holidays occurred) for affording them the opportunity of contacting other landowners who might have been willing to join them in objecting to the proposed Works Plan, they fail to demonstrate that the periods during February, March, and April, 1963, which they apparently might also have devoted to that project, were also insufficient. And there is no claim made in the briefs that the proposed Works Plan was not available for investigation and study during these combined periods.

■■■ Protestant Hilpirt contends that the trial court was without jurisdiction, both of her, and of the subject of the proceedings. She recognizes that she was one of the signers of the petition for establishment of the District, which said petition, as hereinbefore related, was filed in this Court in 1957, but she maintains that this did not give the lower court jurisdiction, years later, to enter orders in the nature of "judgments in personam" against her, without process other than the notices published in the newspapers hereinbefore mentioned, and pursuant to a petition filed in that court captioned: "IN THE SUPREME COURT OF THE STATE OF OKLAHOMA." We do not agree. We think the trial court had jurisdiction over her for the purpose of establishing the present District, after her

signing, and the filing of the petition therefor, without the same character of process that our statutes require in civil actions generally, and even though the name of the court appearing in the caption of said petition was not changed, either before or after said petition's filing in the trial court. The provisions of Section 542, supra, with reference to the filing of such a petition are as follows:

"Before any court shall establish a district as outlined in § 541 of this Title, a petition shall be filed in the office of the Clerk of the Supreme Court of the State of Oklahoma.

\* \* \* \* \* \*

"The Clerk of the Supreme Court shall docket said petition as an original action in said court under the name:

"In re: Conservancy District No. ———, and all such proceedings shall successively be numbered serially from No. 1 upward.

"The said Supreme Court shall within ten (10) days after the filing of such petition determine which district court of said State is most conveniently near the center or middle of said district and can hear and determine said petition with greatest convenience to the people within said proposed district, having in view the customary routes of travel; and shall thereupon refer and assign *said petition* and proceeding to such district court \* \* \*" (Emphasis added).

It is unnecessary for us to decide whether the wording of the above quoted statute *required* the filing in the district court of *the same* petition, without any change whatsoever, that had previously been filed in this court. Assuming that the name of the court in the subject petition's caption should have been changed before it was filed in the trial court, we think that if the omission to make that change created a defect in the pleading, it was one of form, rather than substance, and, under the circumstances, was not fatal to the latter court's jurisdiction to establish the Conservancy District. In the early case of Petrie v. Coulter, 10 Okl. 257, 61 P. 1058, it was said:

"\* \* \* The record shows that, at the time of the objection to the jurisdiction of the district court, it was not made 'on account of the want of certificate or transcript of the probate judge, and the case was tried and presented as if duly certified,' and that the *first suggestion* to the trial judge that the papers were not duly certified *was made* to him *at the time the case-made was presented for settlement.* The journal entry of judgment certified by the probate judge, with the seal of his court, together with the appeal bond, approved by the probate judge, *were brought into the district court* with the papers in the cause, including all the pleadings and these were sufficient to give the district court jurisdiction \* \* \*" (Emphasis added).

The record in the present case shows that although Hilpirt's attorney appeared at the hearing on the Works Plan, April 23, 1963, and obtained the hereinbefore mentioned stipulation as to "process" for the proceedings, never, before the filing of her motion for a new trial (containing general allegations which might vaguely have referred to it) did said protestant specifically invite the trial court's attention to the alleged defect, of which she now complains. It is generally recognized that pleadings are to be regarded in the light of their true character, rather than by their names, or titles (Boose v. Hanlin, Okl., 346 P.2d 932, 935) and, in one case that had been treated by the parties as pending in a particular court, words in the petition, misdescribing said court, were treated as surplusage. See Robinson v. Peru Plow & Wheel Co., 1 Okl. 140, 31 P. 988, 991. In another case, where a statute contained no requirement that certain papers filed under it bear the name of the court in which they were filed, we held it unnecessary for them to be so captioned. See In Re Cary's Estate, 177 Okl. 259, 58 P.2d 533, 534. In this case, no one could have been misled as to the identity of the

court in which the petition for establishment of the District was pending, because the published notice of the hearing thereon clearly showed that the matter was then pending in the District Court of Logan County, rather than in this Court. In view of the foregoing, we hold that Hilpirt's present argument concerning the name of the court, shown in the caption of the petition for establishment of the district, demonstrates no reversible, or prejudicial, error in the trial court's proceedings.

Another of the grounds on which protestants challenged the court's jurisdiction at the trial (during which the Works Plan was approved) was based on the manner in which notice of said trial, or hearing, was given. They contend that the provisions for "notice by Publication" in both sections 544 and 565 of Title 82, supra, require compliance with the statutes pertaining to process in civil actions generally, viz., Tit. 12 O.S.1961, §§ 151, 153, 155, 159, and sections 170–172, both inclusive. The fact that in the case of In Re Central Oklahoma Master Conservancy District, Okl., 359 P.2d 725, we held the Conservancy Act, as then written, was not a special law, as that term is used in our Constitution's Art. V, Section 32, does not, as Hilpirt contends, support her argument. *Notice* by publication is different from *service* by publication, as those terms are used in our statutes, and the present Conservancy Act is not the only legislative enactment providing for proceedings affecting property rights, without requiring either personal service or service by publication. See, for instance, the Oklahoma Oil and Gas Conservation Act (Tit. 52 O.S. 1961, § 81 et seq.) with particular attention to the type of notice prescribed for well-spacing petitions (section 87.1 of the same title). That the Legislature recognized this difference in the enactment of the Oklahoma Conservancy Act is indicated by the fact that in at least one of its sections " * * * service of summons as required in civil actions * * * " is specifically prescribed. See sec. 603 of Tit. 82, supra.

Hilpirt also contends that the notices in this case were void because they were not styled "The State of Oklahoma" as our Constitution's Art. VII, sec. 19 requires for " * * * all writs and processes." We do not agree. As pointed out by proponents citing Burns v. Pittsburg Mortgage Inv. Co., 105 Okl. 150, 231 P. 887, "process", as used in that provision of the Oklahoma Constitution refers " * * * only to that character of process which under the common law would run in the name of the king." (231 Pac.Rep. 889). The notices in question are not that kind of process.

Protestants also complain of findings contained in the order and/or judgment establishing the district, that " * * * the public safety, health, convenience and welfare will be promoted * * * by the creation and organization of a conservancy district substantially as prayed in the petititon filed herein * * * (etc.)." They say: "There is no provision in the statute and no discretion permitted the court to make such a finding." This representation ignores a specific provision in section 542, supra, "Third" for such a finding (and notice the statement in In Re Conservancy District No. 37, supra, as to certain allegations "A sufficient petition" should set forth), but, even without the cited statutory authority, or if it be deemed inapplicable to the present case, this finding would be no cause for reversal, unless the judgment would be insufficiently supported if it were absent or different. See Choctaw Gas Co. v. Okla. Corp. Comm., Okl., 295 P.2d 800, 806. At any rate, there is no claim that said finding constituted a jurisdictional defect, and, since Hilpirt took no appeal to this court within 90 days from entry of said order and/or judgment, under Section 545, supra, she is in no position to challenge the finding in the present appeal.

On behalf of Hilpirt, reference is made to certain orders the trial court entered, on motions of the District's Board of Directors, on three different occasions subsequent to establishment of the Dis-

trict, deleting from it, various tracts of Oklahoma County lands that were previously included within its boundaries. Here, counsel says: "We do not think this was lawful." Then they say this matter is brought to this court's attention because their client, and other protestants, had been denied the opportunity of showing, at the previous hearing on the Works Plan, that the Plan was not feasible. We fail to see any relation between the deletion orders and the exclusion of evidence offered by protestants, that supports their assertion of the unlawfulness of said orders. Section 604 of Tit. 82, supra, specifically contemplates a district's addition, and exclusion, of lands after it is formed, upon recommendation of its board of appraisers; and provides, in part, that as to owners of property to be excluded, "* * * it will be sufficient to notify them of that fact, * * *." Whether proper notice was given of the action of the court in excluding the subject tracts, or not, protestants fail to demonstrate how such notice, or lack of it, had any bearing whatsoever on their being refused permission to introduce the evidence they refer to. We therefore find no merit in their argument.

■ A further argument of protestants, Bridal and Murphy, directed toward the trial court's lack of jurisdiction, is, in substance, that the Conservancy Act is an unlawful grant of power to district courts to regulate the business of a corporation. They say that if a Conservancy District corporation is a private corporation, then the Oklahoma Business Corporation Act (Tit. 18 O.S.1951 and 1961, § 1.1 et seq.) governs it; while, if it is a public corporation, its incurrence of debts is subject to the provisions of Art. X, Section 26 of the Oklahoma Constitution. We do not agree. As proponents point out, assuming that a conservancy district corporation is a private corporation, since the Conservancy Act contains special provisions pertaining to such corporations that are inconsistent with provisions of the Oklahoma

Business Corporation Act, supra, the latter Act is inapplicable to such corporations, under the special exemption prescribed for them in the Oklahoma Business Corporation Act itself (see Section 1.3, Tit. 18, supra).

■ Article X, sec. 26, supra, applies, by its own terms, to "a * * * county, city, town, township, school district, or other political corporation, or subdivision of the State, * * *." A water conservancy district is none of these. In this connection, see People ex rel. Rogers v. Letford, 102 Colo. 284, 79 P.2d 274, 288, in which the court dealt with the same kind of a provision in the Colorado Constitution (Art. 11, sec. 8 thereof) prohibiting cities and towns from contracting loans or debts without submitting the question to their electors. There, the court held that said provision "* * * has no application to an independent entity such as this conservancy district." As to the character of levies made by a city to pay assessments for defraying the cost of such a conservancy district's improvements, the court quoted one of its previous opinions as follows:

"Such taxation, and the indebtedness involved, is not such taxation and indebtedness as is contemplated by section 8, art. 11 of the Constitution. * * * That section applies only to taxation and indebtedness incurred from the governmental purposes of the city. 25 R.C.L. 92. Here the tax is for the purpose of paying an assessment to carry out the purposes, not of the city, but of the conservancy district."

Then the court said: "The general tax authorized by the act is levied by the district for its own purposes, and is not a city or town tax in any sense. * * *" In support of their position, proponents cite Armstrong v. Sewer Improvement District No. 1, 201 Okl. 531, 199 P.2d 1012, in which the Court held that Art. X, sec. 26, supra, does not apply to sewer improvement districts. Though the cited opinion was superseded by a later one on rehearing (see Armstrong v. Sewer Im-

provement Dist. No. 1, 201 Okl. 531, 207 P.2d 917) we agree with proponents that our statements therein as to the character of sewer improvement districts apply similarly to conservancy districts. There we said (199 P.2d, at pgs. 1014 and 1015):

"But a reading of the Act herein involved clearly discloses that the sewer improvement districts therein provided for are not organized for political or governmental purposes and do not possess political or governmental powers other than those necessary to carry out the specific purposes for which they are created. They are in no sense additions to or agencies in aid of the general government of the state, or in the aid of any governmental agencies or functions, but are purely for the purpose of promoting the welfare and benefit of the inhabitants of that particular district. They are in the same class in that respect as the levees, drains, ditches and irrigation systems, * * *."

■ Protestants charge that the Oklahoma Conservancy Act constitutes an unlawful delegation of legislative and administrative power to our district courts. They complain of such courts' administrative control over conservancy districts' operations through the power given them, by the Act, to appoint their corporations' boards of directors (see Sec. 561, Tit. 82, supra); and, in support of their position that the Act unconstitutionally vests said courts with legislative powers, they cite In Re Verdigris Conservancy Dist., 131 Kan. 214, 289 P. 966. We find no merit in the latter contention. The later case of State ex rel. Parker v. Stonehouse Drainage Dist. No. 1, 152 Kan. 188, 102 P.2d 1017, explains and limits the effectiveness of said court's previous opinion in the Verdigris Conservancy District case, to a feature of the former Kansas Act, which the Oklahoma Act does not possess. It is represented, without contradiction, that our Act, like the Colorado Act dealt with in People ex rel. Rogers v. Letford, supra, was taken from the Conservancy Act of Ohio.

This Colorado case cites respectable authorities for holding that such Acts are not unconstitutional delegations of legislative power. We entertain the same views of the powers vested by the Oklahoma Conservancy Act in our district courts that the court expressed in Miami County et al. v. City of Dayton, 92 Ohio St. 215, 110 N.E. 726, with reference to the powers vested by the Ohio Act in that State's court of common pleas. On the basis of the foregoing, we hold that the Oklahoma Conservancy Act does not vest legislative power in this State's district courts in violation of the Oklahoma Constitution's Art. IV, section 1.

■ Nor do we think the Act's grant of administrative powers to these courts is in any respect unlawful. Landowners Protective Association represents that the original members of the District's Board of Directors were appointed from a list of persons submitted to the trial court by the proponents, that two of these three persons are still serving on said Board, and that the Court has appointed one "replacement member." The Association says these Board members " * * * are in reality self-appointed"; and it complains that the landowners have had no voice in their election, "or in any other phase" of the District's "government." If the trial court has appointed any successor of Mr. Tribble, Mr. White, or Mr. Bretz, this has doubtless been due to the fact that the appraisal of benefits provided for in sec. 602, Tit. 82, supra, and whose approval is, by sec. 561 of said Title, made a prerequisite to the first district landowners' meeting for the purpose of electing their successors, has not yet been made or filed. Apropos of the subject under discussion is the following quotation from State ex rel. Chicago, M. & St. P. R. Co. v. Public Service Comm., 94 Wash. 274, 162 P. 523, in People ex rel. Rogers v. Letford, supra:

" 'The constitutional division of all governmental powers into legislative, executive and judicial is abstract and general. Their complete separation in actual practice is impossible. The many complex relations created by

modern society and business have produced many situations which can be adequately met only by vesting in the same administrative officers or bodies powers inherently partaking to some extent of any two or all of these three functions.' And added,

" 'Upon the authorities above cited we conclude that the act does not violate article 3 of our Constitution. It does not delegate legislative or administrative powers to the district court, within the meaning of the constitutional prohibition thereof, since judicial powers are vested by the statute in the court organizing the district, and *the administrative powers complained of are incidental to the judicial functions vested.'* " (Emphasis added).

With reference to the claimed rights of all citizens residing in a conservancy district to vote upon the persons charged with conducting the districts' affairs, it was pointed out in the Letford Case, supra, that the Colorado Constitution guaranteed no such rights to electors of municipal corporations in the selection of the corporations' officials; and, as far as we have been informed in this case, the same may be said of our State Constitution. There the court quoted from its previous opinion in People ex rel. Setters v. Lee, 72 Colo. 598, 213 P. 583, 588, as follows:

" 'Whether owners of land have any right to participation in the administration of quasi municipal corporations "by vote or otherwise" is a political question merely. The right of the Legislature to create a quasi municipal corporation and provide for the manner of its administration and the personnel of its officers in any manner it may see fit is well established.' "

In support of their position, protestants say that Acts which left "no discretion to the judicial body as to the boundaries of the District" have been held unconstitutional, citing Moulton v. Parks, 64 Cal. 166, 30 P. 613, Brandenstein v. Hoke, 101 Cal. 131, 35 P. 562 and Malim v. Benthien, 114 Wash.

533, 196 P. 7. While there may be some doubt as to just what the Moulton Case held in view of comments made concerning it in a later case (see Larsen v. City and County of San Francisco, 182 Cal. 1, 186 P. 757) there is no such lack of judicial inquiry, or discretion, in the Oklahoma Conservancy Act. As hereinbefore pointed out, there is provision in sections 603 and 604, Tit. 82, supra, for court hearings on the inclusion in Conservancy Districts, and/or exclusion from them, of lands other than those that were originally within their boundaries. And, after the inclusion of any new land in such a district, it would seem that its owner, under the provisions of sec. 561, supra, could vote in the next election of the district's board of directors. We think these provisions of our Act render it invulnerable to the decisive objections made to the Colorado, California and Washington legislation dealt with in the above cases cited by protestants.

Protestants further contend that the trial court erred in admitting the Works Plan and Specifications into the evidence of the case, over their objections. The record shows that they first made their objections known at the pre-trial conference of April 18, 1963, and later interposed them when proponents offered the Document into the evidence, as their "Exhibit #1", at the trial on April 23rd during the testimony of Mr. Tribble, Chairman of the Districts' Board of Directors, and after he had identified said Plan as having been approved at the Board's previous meeting on July 2, 1962. In connection with one of their grounds of objection, viz., "The witness presenting it (the exhibit) was not available for cross examination", the record discloses that protestants were allowed to make an offer to prove that Tribble, if permitted, would testify that he is not an economist or engineer, and that he did not draft, or participate in the drafting of, "the cost figures of the water conservation aspect, the flood control aspect, * * * range land, * * * or other uses involved in the Plan, or the economic or tech-

nical engineering presentations included in the exhibit." After the overruling of protestants' objections, and the completion of Tribble's testimony, Mr. Fred Gray, "an Engineer with the Soil Conservation Service" testified, as proponents' next witness, that he is commonly referred to in the Conservation Service as a "Watershed (Planning) Party Leader"; that he had the responsibility of "representing the Soil Conservation Service" and working with the local sponsors in the development of the Works Plan; that he not only participated in developing the Plan, but was responsible for its preparation. Gray acknowledged that "technicians * * * really prepared * * * the Plan", but further testified that this was done under his supervision. Protestants contend that since Gray's testimony was elicited *after* the exhibit was admitted into evidence, said testimony did not cure the trial court's error in having admitted the exhibit without its *first* being identified by the "technical experts" who prepared it, because Gray was *only one* of those experts. Protestants cite no authority in support of their contention, and we find no merit in it. "This court has long adhered to the rule that, before a judgment will be reversed on account of erroneous admission of evidence, it must appear that said error was prejudicial." Midwest City v. Eckroat, Okl., 387 P.2d 123, 126. Assuming, without deciding, that the trial court's admission of protestants' Exhibit #1 into the evidence of the case was error initially, it does not appear that its admission could, under the circumstances, be correctly considered prejudicial to protestants. The Oklahoma Conservancy Act has its own "built-in" harmless error provision. Sec. 616 of Tit. 82, supra, provides in part:

"No fault in petition or any notice or other proceedings shall affect the validity of any proceedings under this Act, except to the extent to which it can be shown that such fault resulted in a material denial of justice to the property owner complaining of such fault, and except as to matters concerning the ac-

quirement of original jurisdiction of the district."

▉ Under "Proposition III" of the third, or "SUPPLEMENTAL" brief that protestants have filed herein, they refer to the fact that the District's invitation to contractors to submit bids on dams numbered 16, 17 and 18, to be constructed in Canadian and Kingfisher Counties, was advertised only in those two counties. They say this gave no notice to Bridal and others of the District's landowners who resided in Oklahoma and Logan Counties, and afforded them no opportunity to protest the advertising of bids and letting of contracts for these dams, and, as to them, constituted a denial of due process. In support of this contention, protestants refer only to Hilpirt's previous argument, hereinbefore dealt with, which argument utterly fails to demonstrate that the invitations for such bids should have been advertised anywhere except " * * * in each county, *where any part of the work* under terms of the contract *is to be performed*, * * *" (Emphasis added), as they recognize has been the law since the amendment to Title 82 O.S.1961, section 569, became effective June 13, 1963. See S.L.1963, p. 380, Title 82 O.S.1963 Supp. § 569.

▉ Protestants refer to the fact that the trial court conducted its review of the District Board of Directors' action in advertising for bids and awarding contracts for dams 16, 17 and 18, upon the application of John Bridal, but dismissed the protest of Washecheck and the other mineral interest owners who joined him in it, on the ground that they were *not interested taxpayers* within the meaning of section 569, supra. They characterize this as paradoxical, since the latters' mineral interests are in Canadian County, one of the two counties in which the invitation for bids was advertised, while Bridal's land ownership is in Logan County, in which the invitation was not advertised; and they urge that: "For the very reasons advanced by this court in Kuhr et al. v. Goggins [Goggin] et al. * * * (In re Conservancy Dis-

trict No. 37, supra) Ed Washecheck et al should be construed as interested taxpayers within the meaning of 82 O.S.A. 569 as amended." It is difficult for us to follow this argument and to see how the cited case could support the argument that the owner of no more than a mineral interest in land outside the boundaries of a conservancy district is an "interested taxpayer" within the meaning of that term as it appears in the statute. If the cited case is any precedent at all for an interpretation of that term—when used in connection with reviewing a contract award (as distinguished from protesting the establishment of a conservancy district, as was the situation there)—it would seem to support the trial court's exclusion of Washecheck et al., from the scope of said term, or expression. But, we think the real cause of these mineral owners' complaint is more basic than a dispute over names, or their meaning. It stems from their apprehension that the building of Dam #16 will interfere with, or preclude, exercise of their rights of ingress and egress, without their ever having had any voice (since the tract lies outside the district's boundaries) in the formulation, or approval, or rejection of the Works Plan, or proceedings contemplated to ultimately bring about such claimed usurpation of such property rights. (In this connection notice the comments on Malim v. Benthiem, supra, in Carstens v. Public Utility Dist. No. 1, Wash., 111 P.2d 583, 590). It is argued, in substance, that if the District can usurp these property rights in land beyond its boundaries, then it can do the same thing with reference to private property rights anywhere in the State. Pertaining to this matter, the transcript of the trial court's hearing on September 25, 1964, reflects the following:

"*      *      *      *      *      *

"MR. RUSSELL:

*      *      *      *      *      *

"Now, in connection with the land a part of which will be covered by water, if my information is correct and from what I can tell from the map, incident to the construction of Dam Site #16,

these individuals own mineral rights, and * * * they (the District's Board of Directors) have acquired all necessary surface easements for the construction of that dam site but they have not acquired any easement insofar as the mineral rights are concerned, and we feel that this is a major cost factor and has not been taken into consideration in connection with the Work Plans and Specifications, and we feel that the construction of these dams is in derrogation of the rights of the mineral interest holders, and we feel that this matter should be considered by this Court in connection with approval of the contracts for construction.

"MR. SHORT: Well, we have had no opportunity to gather any facts upon which this particular protest is based, but I would say, however, that I am informed that the construction of these dams does not require the securing of any easements * * * from the holders of mineral rights, and that if the minerals are there, why, they can be obtained, particularly if they are oil and gas.

*      *      *      *      *      *

" * * * I know of nothing that requires these casements to be obtained, and I know of nothing that would require such clearances, before this contract could be let or before this work could go forward. Now, if it be true that the mineral owner has suffered a damage, then he does have his day in Court and his right to claim his injuries in reverse condemnation, but I don't believe this is an appropriate matter for consideration as a legal point at this time.

"THE COURT: I have one question, and it might settle all of this, and that is if the Court would have to know whether or not these four parties own land within the bounds of the Conservancy District?

*      *      *      *      *      *

"THE COURT: I take it that before they would have a right to file this as an interested taxpayer that they would have to be within the District. * * *"

If the principal concern of Washecheck et al. is that the value of their mineral rights will not be taken into consideration in calculating the cost of carrying out the Works Plan, their fears may be premature and groundless, if the District's Board of Appraisers, when it compiles the "conservancy appraisal record" mentioned in Tit. 82 O.S. 1963 Supp., § 605, includes therein an appraisal of their damages, under the provisions of section 603, Tit. 82 O.S.1961, which provides, in part, as follows:

"If the appraisers find that lands *or other property* not embraced within the boundaries of the district will be necessary for, or affected by, the proposed improvement, * * * they shall appraise the * * * damages to such land and shall file notice in the court of the appraisal which they have made upon the lands beyond the boundaries of the district, * * *" (Emphasis added).

and Tit. 82 O.S.1963 Supp., § 602(b), which seems to make an order, or direction, by the court, a condition to the appraisers' including any estimate of such damages in their report. Under the provisions of Tit. 82 O.S.1963 Supp., sec. 607, it would appear that "any property owner * * *" may accept such appraisal of damages. Thus, presumably, the District could, after the inclusion of an item in the appraisers' report, or conservation appraisal record, for damages to these mineral interests, make settlement with Washecheck et al.; and the controversy would be at an end. However, in view of the Twenty-Ninth Legislature's amendment of Tit. 82 O.S. 1961, § 607, by adding to the end of said section the following: "* * *, except there shall be no right to acquire mineral interest by condemnation" (see S.L.1963, p. 383, Tit. 82 O.S.1963 Supp., sec. 607), there is room for doubt, not only as to whether

the trial court will see fit to order that an estimate of such damages be included in the District's Appraisers' report, but, also, as to whether the district's attorney's above quoted indication that condemnation provides these owners with a remedy, will obtain acceptance in other quarters. Be these things as they may, we are inclined to the view, however, that even if we assume, without deciding, that Washecheck et al. have property rights that are entitled to recognition at the appropriate time, the court acted correctly in refusing, at the time of the last order appealed from herein, to allow this to prevent the letting of contracts for construction of Dams numbered 16, 17 and 18. When the District Appraisers' Report is filed it is contemplated, under Tit. 82 O.S.1963, § 606, that there will thereafter be a court hearing on it; that notice thereof will be directed "to every person returned by the appraisers as the owners of any lot or parcel of lands affected by the proposed improvement, or of any interest therein * * *"; and "* * * the court will hear said report and any objections that may be filed thereto * * *." Tit. 82 O.S.1961, sec. 609, provides for appeals from awards as to damages, but sec. 613 of said Title admonishes that:

"No appeal under this Act shall be permitted to interrupt or delay any action or the prosecution of any work under this Act. * * *"

A reading of the entire Oklahoma Conservancy Act impels the view, apparently entertained by the trial court, that the rights of the protestants are in no way impinged, or foreclosed, at the present stage of the District's operations; that the Act provides adequate avenues of protection for them, if, as, and when, such injury does occur; and that the court's powers, and scope of inquiry at such hearings as are involved here, are restricted by the Act's provisions. Protestants' "SUPPLEMENTAL BRIEF" states that an appeal from an order made at the hearing on the District's Appraisers' report "would be a relatively futile thing",

but this ignores remedies other than by appeal, which they might obtain, if, as, and when their property rights are impinged, *prior* to an opportunity for relief by that method. We think that as their anticipated injuries have not yet become a reality, and it is still uncertain whether they will be able to obtain relief for them, if they occur, by the means provided in the Oklahoma Conservancy Act, their present complaints may be considered premature. In this connection notice Speaker v. Board of County Comm'rs, Okl., 312 P.2d 438, 442.

We have arrived at similar conclusions with reference to the complaints of John Bridal. He continues to maintain, as he did in the hearings in the trial court, that exclusion from the Conservancy District, of Canadian County lands, stipulated to be benefitted by the carrying out of the Works Plan, will result in the lands owned by him, and other owners of benefitted land within the boundaries of the district, being assessed a larger portion of the maintenance and "potential" costs of the District's proposed improvements, than would be the case if that Canadian County land was included in the District. The latter land, it is argued, will be obtaining the same character of benefits that we said in the case of In Re Central Oklahoma Master Conservancy Dist., Okl., 359 P.2d 725, 728, is denied by the Oklahoma Conservancy Act to "intervening territory" within such a district. On the other hand, the proponents call attention to the fact that benefitted lands outside the district may be brought into it later, in which event they will be assessed for their benefits from the District's improvements. They further say that assessments for such benefits will be based on appraisals of benefits to given parcels of land, and not on a uniform per-acre basis, so that the tracts that are the most benefitted will pay the greatest percentage of the district's costs, rather than paying in the ratio of their number of acres, to the total number of acres of benefitted land in the district. Our atten-

tion is invited to no part of the record in this case that resolves this dispute about how the benefits of the District's improvements will be appraised and assessed. It is obvious from the trial judge's remarks, when he approved the present Works Plan, that he anticipated the Plan might be "altered in detail from time to time until the assessments of benefits have been filed", and that since the Plan, and the evidence introduced in support of it, meet the requirements of the Conservancy Act, his power was restricted largely to approving the Plan. We are not certain the Judge was correct in adopting so restrictive a view of his powers at hearings on Works Plans. We do feel certain, however, that the controversy about benefitted lands bearing their fair share of the District's maintenance and "potential" costs may more nearly be resolved after the District's Board of Appraisers has made its report, and before any such costs are assessed against any land. Tit. 82 O.S.1961, § 603, provides certain ways in which benefitted lands outside a Conservation District may be dealt with in this regard, and Tit. 82 O.S.1963 Supp., sec. 548, provides another. We are of the opinion that the argument concerning the appraisal of benefits and assessments of costs is now premature, and that the Oklahoma Conservancy Act provides ample means for judicial resolution of such a controversy, if it arises, or reoccurs, after the District's Board of Appraisers has made its report.

We agree with other views orally expressed by the Trial Judge to the effect that the fact that there may be, or is submitted at such a hearing, one or more other Works Plans that would accomplish the purposes for which the District was established, is no legal obstacle to approval of the Plan presented by the District's Board of Directors—if the latter meets the requirements of the Oklahoma Conservancy Act.

In accord with the foregoing, the orders, and/or judgments, of the trial court herein appealed from, are hereby affirmed.