In the Matter of BABY BOY FONTAINE, a Dependent Child.

No. 45245.

Supreme Court of Oklahoma.

Oct. 24, 1972.

Rehearing Denied April 2, 1973.

Certiorari Denied and Appeal Dismissed Oct. 9, 1973. See 94 S.Ct. 72.

John B. Hayes and Clyde J. Watts, Watts, Looney, Nichols & Johnson, Oklahoma City, for appellant.

Joe Cannon, Oklahoma City, for appellee.

BARNES, Justice.

A 24-year-old Texas woman (we will call "Jean") discovered she was pregnant after completing a semester of her junior year in one of that State's Universities. To prevent her parents from learning of her condition, she sought help in said University's city from an acquaintance on the staff of a nation-wide campus religious organization and, through her, was placed in telephone contact with Mr. C, an Oklahoma City resident, who is Regional Director of said organization. After Mr. C. was apprised of Jean's situation, he furnished her an airline ticket to fly to Oklahoma City to stay until after the baby's birth. After her arrival here, Jean met Mrs. J, Director of Counseling and Placement for an organization (we will refer to merely as the "Agency") which was incorporated under the sponsorship of a local church to render assistance to unwed mothers.

After some three months of lodging and sustenance arranged for her by Jean's new-found friends here, she was delivered in a local hospital (we will refer to as "X Hospital") of a child referred to as "Baby Boy Fontaine". After discussions as to whether Jean should keep Baby Boy Fontaine or offer him for adoption, Mrs. J drew up documents to have him legally declared a dependent and neglected child and eligible for adoption. One of these documents, a verified "Petition", which recited, among other things, that "Petitioner does hereby terminate all her parental rights" in the child, was left with Jean to read in her hospital room, while Mrs. J went to the Oklahoma County Court House in quest of a Judge to act in the matter. As the District Judge regularly assigned to juvenile cases was out of town, Mrs. J procured another District Judge (we will refer to as "Judge U") to accompany her to Jean's hospital room. After Jean had signed this petition there in the presence of her roommate, Mrs. J, and Judge U, the Judge signed two orders Mrs. J had drawn. One of these orders authorized the hospital to

deliver the baby to the Agency and the other (denominated, and sometimes hereinafter referred to as, "Journal Entry") made him a ward of the Court and committed his custody to the Agency. Mrs. J then filed the petition and orders in the District Court and they were docketed as its Cause No. JF–71–668.

Thereafter, Baby Boy Fontaine was placed in the possession of a couple (we will refer to as "Mr. and Mrs. R") in accord with a "REPORT" the Agency filed (through Mrs. J) in said cause on August 10, 1971, the day after the above mentioned petition and orders were filed. The Report recommended court authorization for Mr. and Mrs. R to take the baby to Iowa for adoption there.

Within a month after Jean left Oklahoma City to reside with her parents in San Antonio, they learned from her what had occurred and wanted to help her recover the baby. After this family contacted an Oklahoma City lawyer, the present proceedings were instituted in Jean's behalf by the filing in Cause No. JF–71–668, supra, of an application to withdraw the petition and set aside the previous orders filed in said cause as aforesaid.

In opposition to this application, the Agency filed a response praying, among other things, that Jean's application be denied and that the baby's custody, for the purpose of finding him a suitable adoptive home and consenting to his adoption, remain in the Agency.

After it was established, at a trial on the application and response before the District Judge regularly assigned to juvenile cases, that Jean had never been sworn to testify, and had given no sworn testimony, concerning the facts alleged in her aforementioned petition, the Court ordered Baby Boy Fontaine returned to Jean, after the following pertinent findings:

"* * * that no evidence was taken by Judge . . . (U), nor was any sworn testimony taken by . . . (him) prior to his signing said Journal Entry; that the proceedings before Judge . . .

(U) were fatally defective for the purpose of conferring jurisdiction upon the Court to find said Baby Boy Fontaine a dependent child within the purview of the Juvenile Code and to make him a ward of the Court; that parental rights of said . . . Jean . . . were not terminated in accordance with the laws of the State of Oklahoma; * * *."

From said judgment, the Agency has perfected the present appeal. Its position, generally, is that the trial court erred in nullifying, by said judgment, the previous court orders, and, in effect, setting aside the "Journal Entry" or order Judge U signed in Jean's hospital room, which found "that Baby Boy Fontaine comes within the purview of the Juvenile Code as a dependent child . . .," made him a ward of the Court, as such, and committed his custody to the Agency. Under the second and third propositions of its brief, Agency urges that said order was sufficient to terminate Jean's parental rights in the baby and that the consent she expressly gave in her aforementioned petition to the termination of said rights should not be nullified, absent a showing that it was given as a result of fraud or undue influence.

The portion of this State's statutes that has been referred to in this case as the "Juvenile Code" is Senate Bill No. 446 of the Thirty-first Legislature's Second Regular Session (S.L.1968, ch. 282, p. 444ff) as amended (10 O.S.1971, §§ 1101 through 1142, 1201 through 1210, 1301 through 1303, 1401 through 1404, 1501, 1503, and 1504). By the definition of the term "dependent or neglected child", in said Act's first section, Section 101(d) as amended by the Thirty-second Legislature's Senate Bill No. 375 (S.L.1970, ch. 86, pp. 108 and 109), and incorporated in Tit. 10, O.S.1971, as Section 1101(c), the following persons (among others) are placed within the purview of the Act:

". . . any person under the age of eighteen (18) years who is for any reason destitute, homeless or abandoned; or

who is dependent upon the public for support * * * *"

■　The Act's requirement, upon which the judgment appealed from herein was apparently based, is found in Section 1111, Tit. 10, supra, which section begins and ends as follows:

"All cases of children shall be heard separately from the trial of cases against adults.

\*　　\*　　\*　　\*　　\*　　\*

*A decision determining a child to come within the purview of this Act must be based on sworn testimony* and the child must have the opportunity for cross-examination." (Emphasis added)

The above section obviously does not apply to the present case. Tit. 10, § 1103, supra, with its paragraph "(a)" indicates a marked distinction between cases instituted under said Title's Sections 1102 and 1103 (contemplating that "any person" may inform the District Court that a child is "within the purview of this Act") in which parents' parental rights may be taken from them by adversary proceedings, and those cases in which termination of such rights is requested by the parents themselves. Paragraph "(2)" of 10 O.S.1961, § 60.5, referred to in that paragraph "(a)", authorized written consent to the adoption of an illegitimate child to be given by the mother alone, and paragraph "(5)" of that 1961 Section required only that said consent be acknowledged before one of the judges possessing the jurisdiction therein indicated, and allowed a non-resident's acknowledgment to be executed either before such a judge or one having original probate jurisdiction in the county and state of her residence.

■　Thus clearly in a case involving an illegitimate baby such as Baby Boy Fontaine, where, at the time his mother's written consent was signed and acknowledged, there was (and still is) no question but that he was a "dependent or neglected child", as that term is defined in S.B. 446 as amended, supra, and he was (by reason thereof) "within the purview of this Act"

(Section 1111, supra), the taking, and/or recording, of sworn testimony was not necessary to give the Court jurisdiction "to find" him "a dependent child . . . and to make him a ward of the Court", as the trial court apparently believed. Dispensing with the formal introduction of evidence to establish undisputed facts has been approved in previous cases (see, for instance, Bridal v. Cottonwood Creek Conservancy Dist. No. 11, Okl., 405 P.2d 17, 26); and Jean's counsel's argument has failed to convince us that anything possessing the formal characteristics of "sworn testimony", as that term is used in Section 1111, supra, was necessary to give the Court, acting through Judge U, jurisdiction over Baby Boy Fontaine, as a dependent child.

Sections 1104, 1111, 1113, and 1114, supra, which, as Jean's brief points out, were not complied with in this case, obviously apply to proceedings instituted by a party other than the mother of an illegitimate baby. According to the never disputed statements in Jean's verified petition, she was (at the time of said document's execution and filing) "without a home of her own" and was "financially unable to care for, nurture, and educate" Baby Boy Fontaine. The undisputed evidence in this case shows that the only alternative, of which Jean then knew, to her relinquishment of this child, was the acceptance of monetary Aid to Dependent Children from the Oklahoma Department of Public Welfare. This accords with her petition's statement that, for the above recited reasons, "the child is dependent upon the public for support."

While at the trial Jean answered in the negative a question propounded by her counsel as to whether she was "sworn as to testify" before she signed "the papers", the verification on her petition bears the attestation, above the signature of Judge U, that it was "Subscribed and sworn to before me this 9th day of August, 1971", and, below this, the petition also bears Judge U's certification that Jean appeared before him that date "and stated that she

signed the above and foregoing Petition of her own free will and accord in my presence." None of the testimony at the trial disputes the fact that Judge U saw Jean sign the petition and its verification; and, since Jean's brief concedes that her "petition is probably sufficient to conform to the statute", and the trial court's judgment does not appear to be based upon any deficiency therein, we find it unnecessary to pass upon its sufficiency to invoke Judge U's consideration of the court action therein prayed for.

■ Under her brief's "Argument No. 1", Jean's counsel points to the similarity in the wording of Judge U's Journal Entry in this case and that of the order involved in In Re Richmond, Okl., 484 P.2d 880. The tenor of her argument is that since we treated the order in Richmond as *not* terminating the unwed mother's parental rights in that case, Judge U's Journal Entry in this case must be treated likewise. We do not agree. We think it of crucial significance that in this case Jean's petition states: "Petitioner does hereby terminate all her parental rights and voluntarily consents for the Court to enter an order terminating her rights . . . ." This can be characterized as no less than an unmistakable and unequivocal relinquishment of Jean's parental rights. The petition filed in the Richmond case contained no such statement or allegation. In the Richmond case, we were of the opinion that the order involved there could not be considered within the frame of reference specifically delineated, in Section 1118's prohibition against modification, as "an order terminating parental rights." It therefore follows that In Re Richmond, supra, is distinguishable from, and has no application to, the present case.

■ Jean's efforts in the trial of the present case were directed toward showing —not that Baby Boy Fontaine was not a dependent child at the time he was so adjudged in Judge U's Journal Entry—but, instead, that because of Jean's previous religious training, she was strongly persuaded to sign the petition by representations of Mrs. J, and the Oklahoma City minister who had befriended her, that it was "God's will" that she relinquish the baby for adoption by a married couple. This was denied by Mrs. J and the minister; and a review of the evidence as a whole convinces us that Jean's natural desire to keep her baby was overridden—not by anything anyone told her—but by her own conclusion that she could not keep the child without her parents' discovering his origin and censoring her. Also, as the Court in In Re Surrender of Minor Children, 344 Mass. 230, 181 N.E.2d 836, 839, said:

> "Contemplation of the surrender of one's own child is in many, if not all, cases a cause of emotional and mental stress. Many such surrenders are undoubtedly by *mothers of children born out of wedlock and are contemplated because the trying circumstances tend to show that the welfare of the child calls for action at variance with that dictated by natural instincts of maternal love and affection. No statute has said that surrenders are valid only if executed free from emotion, tensions, and pressures caused by the situation. No principle of law requires the rule. A balance of the interests of the persons concerned and of society weighs strongly against it."* (Emphasis added)

Furthermore, if Jean misapprehended the availability of her parents' assistance in raising the child, this "was her misapprehension" (see Application of Hendrickson [Mont.], 496 P.2d 1115, 1118), which she might have corrected before she signed the petition.

It is inconceivable that the Legislature did not intend the termination of parental rights for the purpose of adoption to have stability. Without this, unwed mothers in Jean's situation would not only be denied an avenue of avoiding the disgrace or public disapproval, as well as filial outrage and/or embarrassment, which may result from disclosure of their pregnancies, but, more importantly, their illegitimate off-

spring would be denied the advantages of growing up in a conventional two-parent home and relationship. For, without such stability, adoption agencies, as well as couples who were prospects for good adoptive parenthood, would be reluctant to undertake the effort and expense accompanying the birth, medical care, and/or adoption of such children. In this connection, notice the discussion in Welfare Division of Dept. of H. & W. v. Maynard, 84 Nev. 525, 445 P.2d 153.

In accord with the foregoing, it is our opinion that the judgment of the trial court was in error. Said judgment is therefore reversed, and this cause is remanded to said court with directions to set same aside and to render a new judgment denying Jean's application.

BERRY, C. J., DAVISON, V. C. J., and JACKSON, LAVENDER and SIMMS, JJ., concur.

WILLIAMS and HODGES, JJ., dissent.